**Lloyd H. SMITH et al., Appellants,**

v.

**Weaver MOORE et al., Appellees.**

**No. 14997.**

Court of Civil Appeals of Texas.

Houston (1st Dist.).

Feb. 29, 1968.

Rehearing Denied March 28, 1968.

Hutcheson, Taliaferro & Hutcheson, Thad T. Hutcheson, John D. Roady, Thomas N. Crowell, Houston, for appellants.

Cleaves & Cleaves, Wilbur S. Cleaves, Houston, for appellees, Mrs. Sadie C. Blaffer and others.

Williams, Lee & Lee, Jesse J. Lee, James W. Lee, Houston, for appellees, Weaver Moore and others.

Butler, Binion, Rice, Cook & Knapp, Jack Binion, William C. Perry, Claude C. Roberts, Houston, for appellees, The Houston Post Co. and Mrs. Oveta Culp Hobby.

PEDEN, Justice.

The plaintiffs sought a declaratory judgment holding that certain building and use restrictions embodied in a recorded instrument called the "Agreement Creating Shadyside," and incorporated by reference in the original conveyances of lots in the subdivision, are of permanent or indefinite duration (at least until there is an abandonment or waiver of them or a substantial change of conditions so as to make them unenforceable). Alternatively, they asked that the owners of a majority of the lots be declared authorized to amend, alter or extend the duration of the restrictions. Some of the defendants sought a declaratory judgment holding that the restrictions expire on June 30, 1969. They also sought other relief, as will be set out.

Trial was held without a jury. From a judgment entered for defendants on the points which we have listed, plaintiffs filed their appeal.

We will refer to the parties by their trial court designations. Some of those named as parties defendant did not actively participate in the trial and do not appeal from the judgment; we will henceforth refer only to the active participants when we use the term "defendants".

Shadyside is a highly exclusive residential subdivision. Montrose Boulevard, South Main Street and Hermann Park border it on the east; Bissonnet Street, the Museum of Fine Arts, the Warwick Hotel and the Mecom Fountain are just north of it, and Rice University adjoins it on the south. The residential areas west of Shadyside are separated from it by a 30-foot-wide strip of large plantings. Its interior streets and sidewalks are privately held in trust for the owners of its lots.

Shadyside was developed by Mr. J. S. Cullinan, a business and civic leader, who bought the land from Mr. George Hermann's estate in 1916, and donated part of it for the Art Museum and the Sunken Garden (site of the Mecom Fountain). He built his own imposing home in Shadyside. He conveyed almost all of the other lots to friends and to members of his family.

The agreement creating Shadyside was filed for record in the Harris County Clerk's office on September 29, 1919. Since the decision in this case turns upon its interpretation, we will set it out here; the letters in the left margin have been added for easy reference:

Agreement Creating

SHADYSIDE

(A.) THIS TRUST AGREEMENT AND CONVEYANCE, made at Houston, Texas, as of date July 1, 1919, between J. S. Cullinan, a citizen and resident of Houston, Texas, (hereinafter called Grantor) party of the first part;

(B.) W. W. MOORE, HENRY STUDE and H. A. KIPP, all citizens and residents of Houston, Texas, (hereinafter called Trustees) parties of the second part, and

(C.) CERTAIN BENEFICIARIES, who are now or shall hereafter become parties hereto in the manner herein provided, (hereinafter called Lot Owners) parties of the third part.

(D.) WHEREAS, said Grantor is possessed and seized in fee simple of

two certain tracts of land, hereafter to be known as SHADYSIDE, situated within corporate limits of the City of Houston, being hereinafter fully described, and which said Grantor has determined shall be subdivided into residence lots, roadways, etc., with characteristics as shown upon the map thereof, copy of which is hereto attached and made part hereof; and being desirous of making provisions for administration of the properties and of creating certain restrictions in regard to the lots therein;

(E.) NOW THEREFORE, in consideration of the premises and of one dollar in hand paid by said Trustees, receipt of which is hereby acknowledged, and for the further purpose of creating a Trust as hereinafter defined, I, the said Grantor, J. S. Cullinan, have granted, bargained, sold and conveyed, and by these presents do grant, bargain, sell and convey unto the said Trustees above named, and to their successors as such, all as joint tenants and not as tenants in common, as long as this Trust shall endure, subject in all respects to the further terms of this instrument, all and singular the following property, to wit: Two tracts of land situated within the corporate limits of Houston, Harris County, Texas:

(F.) FIRST TRACT: Consisting of about thirty-six (36) acres of the Jos. Gamble Survey, fully described in a deed to said Grantor, recorded in Book 359, page 330, of Deed Records of said County;

(G.) SECOND TRACT: One and One-tenth (1.1) acres of the O. Smith Survey, being fully described in a deed to said Grantor, recorded in Book 429, page 485, of the Deed Records of said County; to which deed and the records thereof reference is hereby made for precise description; provided, however, that of said property there is expected from this conveyance and reserved to the Grantor, title to each and all of the twenty-four lots designated by letters upon said map from A to X, both inclusive, but in respect to such lots certain restrictions are provided and shall apply as hereinafter set forth. (There is also excepted from this conveyance the strip of litigated land which, under the terms of Grantors purchase, he became entitled to acquire when his grantors shall have established their claim to the same).

(H.) TO HAVE AND TO HOLD, all and singular the above described premises, together with all improvements and appurtenances thereto incident and belonging unto the said Trustees, their successors and assigns, as joint tenants and not as tenants in common, as aforesaid, and to their proper use and behoof so long as this Trust shall endure; all, however, to be so held in trust for the uses, intents, and purposes, and subject to the terms, restrictions, and conditions hereof as follows:

1. This Trust shall endure during the lifetime of the last survivor of the three Trustees named herein, and for twenty-one years thereafter; not, however, to exceed the period ending June 30, 1969.

2. The beneficiaries hereunder are those who now or may hereafter own one or more of the lots in Shadyside, such lots being twenty-four in number, each designated with a letter of the alphabet serially from A to X, both inclusive; and in all things pertaining to this Trust one vote shall be allowed to the owner thereof for each such lot, and in every instance a majority

of the votes shall prevail. All rights as a beneficiary hereunder shall pass with title and as incident thereto without further acts of any parties.

3. The duties of Trustees shall be to hold title to and administer the properties vested in them, and to keep proper records and accounts of all things pertaining to the Trust.

4. The Trustees severally shall hold their positions as such until their respective successors shall be properly designated and qualified. Vacancies shall be created by death, resignation, or removal of residence from Harris County. Upon occurrence of any vacancy, a successor Trustee shall be named by the remaining Trustee or Trustees by instrument in writing duly acknowledged for record, and if expedient such shall be signed by the old Trustee, and must be signed by the successor as well as by the other or others, and such signature by the successor Trustee shall constitute qualification and thereupon he shall succeed to every right, interest and authority of his predecessor to the same effect as if named as one of the original Trustees.

5. The wishes of a majority of Lot Owners (counting one vote for each lot) expressed in writing, or otherwise, shall be binding upon the Trustees in the matter of naming successor Trustees and upon any question of policy which may arise in the administration of the Trust. If all positions of Trustees shall become vacant, the Lot Owners shall have authority in like manner in writing to name successors.

6. The Trustees shall act by majority, and may appoint officers and agents, and define and delegate the duties of such, and make provision for expenditure for the benefit of the Trust any moneys which may come into their hands in any manner.

7. By ownership of or succeeding to title to a lot, such owner shall thereby become a beneficiary and party herein, and be deemed thereby to have promised and shall become liable to pay to the Trustees any and all such assessments as they may from time to time levy upon the lots in raising funds for the purposes of the Trust, and all such shall be deemed part of the purchase money for such lots respectively, and the same shall stand as security therefor pro rata, and each lot and owner thereof to be thus liable for one twenty-fourth of the whole amount or amounts which shall from time to time be so levied.

8. Trustees shall have control and direction of all the roadways, sidewalks, esplanades, or other areas to which they hold title, and may direct and prescribe the character, construction, and maintenance of all improvements thereon, consisting of planting, paving, curbing, sidewalks, street lighting, or other kinds.

9. Upon each of the several residence lots is a central or interior area, separately colored upon the map, which shall be deemed the Building Space, and coincident with the outer lines and around such building space, and otherwise colored on said map, is a Planting Space; the dimensions of said Building Space and Planting Space being further shown in feet. All buildings and other overhead structures shall in every case be confined to such Building Space, and no such shall be erected on the Planting Space.

10. There shall be but one home erected on each lot, the construction of which shall be commenced within

two years from the date of sale of such lot.

11. Where the owner of two or more lots desires to use them for a single residence site, the Trustees are authorized to eliminate the building lines adjacent and parallel to the present dividing lines between the combined lots.

12. Pole lines or overhead wires may be erected on a space five feet in width along the West line of the larger tract, but no such shall be permitted on any other portion of said premises; but in lieu of such, underground conduits for wires, and pipes for water, gas, etc., shall be provided and located on each lot in the space reserve therefor, as shown on the map of Shadyside, and the Trustees shall have authority to construct the same, or to grant easements and reasonable terms for all such, and provide for uses thereof. Lot owners shall in every case make provision for proper continuation of all such for use upon their own premises.

13. The Trustees shall not have power to bind or to obligate themselves or the present or future Lot Owners personally, and in every written contract into which they may enter this fact shall be appropriately recited, and such contract shall refer to the terms and limitations of this instrument in these respects and the other party or parties to such contract shall agree not to look to such Trustees, or either of them personally, nor to the Lot Owners, or either of them personally, but to the properties only, such as may be held by the Trustees for any enforcement of such contract and the consequences thereof legally or otherwise.

14. Any Trustee may be or become a Lot Owner and may have and exercise all privileges and benefits of such to the same extent in the same manner as any other Lot Owner and may cease to be such, all without in any manner affecting or impairing his position as Trustee.

15. The Trustees shall serve without personal compensation, but shall be entitled to charge against the properties any expense or liability of any kind which they may have legally incurred, and it is expressly agreed that in no event shall any Trustee be held liable for any act or for consequences of such, provided only he shall not have so acted in bad faith.

16. That the right and privilege to frequent, use, and enjoy the property herein conveyed shall be an easement attached to each and every of the said twenty-four plots of land, and passing as appurtenant thereto; and to be had, held, and enjoyed in the manner aforesaid by the Owners of the said lots, as well as the person or persons from time to time owning the same, and their respective families occupying the same, provided they shall make the annual payments before provided for and observe such regulations as aforesaid, but not otherwise.

17. No business house or houses, saloon, hospital, public boarding house, place of public entertainment, store, livery stable, or other place of business or public resort, shall ever be erected on any part of said land, nor shall any telegraph, telephone or electric light poles or overhead structures ever be erected on any part of said property except on a space five feet in width along the West line of the larger tract.

18. IT IS FURTHER PROVIDED, DECLARED AND AGREED that if Grantor, his heirs,

executors, or assigns, hereafter owning any of the said twenty-four lots, shall infringe or attempt to infringe, or omit to perform any of the covenants, conditions, or restrictions herein contained relating to such lots or to any other premises herein described, or to the use and improvement of the same, it shall be lawful for the said Trustees for the time being in behalf and for the benefit of either themselves and the owners of the said lots, or for any or either of them, to prosecute any proceedings at law or in equity against the person or persons infringing or attempting to infringe, or omitting to perform such covenants, conditions, or restrictions, and either to prevent him or them from doing so, or to recover damages or other dues for such infringements or omissions.

19. IT IS FURTHER EXPRESSLY PROVIDED that the title to all the property included in this Trust shall, at its expiration, however terminated, be vested in the City of Houston for the use of the public, unless it shall then be otherwise provided by the Trustees, acting under the direction and by authority of the owner or owners of a majority in number of all the said lots.

(I.) And the Trustees, and each for himself, do hereby accept the aforesaid conveyance and trust, and covenant to perform the same; provided, and it is understood, that they and their successors from time to time may employ as the expense of such Trust, such collector or accountant, or other agent or agents, as may be found necessary to attend to and perform the details of the said trusts and powers; and provided, further, that they and their successors in the said trusts shall each be responsible only for his own acts or willful defaults, if any, and not one for the other or others.

(J.) IN WITNESS WHEREOF, the said parties have hereto interchangeably set their hands and seals the day and year first above written.

(Sgd)  J. S. CULLINAN
                              Grantor

(Sgd)  W. W. MOORE

(Sgd)  HENRY STUDE

(Sgd)  H. A. KIPP
                              Trustees

Witnesses:

(Sgd)  B. W. WARD

(Sgd)  CECILIA FINNIGAN

---

Acknowledgments in proper form were attached.

Without question the contingencies which might have caused the termination of the trust before June 30, 1969, have not occurred.

Plaintiffs' first point of error complains of the "error of the Court in finding and declaring as a matter of law that the Agreement Creating Shadyside and the related original deeds to lot owners provide for termination of the building and use restrictions on June 30, 1969, and in failing to find

and declare that such restrictions are of perpetual or indefinite duration."

■ The judgment of the trial court recites that the meaning, interpretation and construction of the Agreement Creating Shadyside relating to the duration of the building and use restrictions and to the authority and duties of the trustees can be and have been resolved and determined by consideration of the Agreement as a whole and without reference to extrinsic or parol evidence. Further, that the intent with respect to any such matter is manifested by. and from within the Agreement itself. From this it is clear that the trial judge found no ambiguity in the Agreement concerning the duration of the building and use restrictions or concerning the authority and duties of the trustees. We agree, and the basic position (defendants plead ambiguity in the alternative) of all the parties to this appeal is also in agreement as to this lack of ambiguity. Since the Agreement is not ambiguous, we do not apply the rule of strict construction of a deed against the grantor. Arnold v. Ashbel Smith Land Co., 307 S.W.2d 818 (Tex.Civ.App., 1957, writ ref., n. r. e.); Citizens National Bank in Abilene v. Texas & P. R. Co., 136 Tex. 333, 150 S.W.2d 1003 (1941); Wald v. West MacGregor Protective Association, 322 S. W.2d 338 (Tex.Civ.App., 1960, writ ref., n. r. e.).

■ The Agreement Creating Shadyside is principally, but not entirely, a trust instrument; the cardinal principle to be observed in construing a trust instrument is to ascertain the settlor's intent with the view of effectuating it.

It is stated in *57 Tex.Jur.2d, § 29, Trusts:*

In construing an instrument purporting to create a trust the rules for the interpretation of deeds, wills and other written instruments are followed. Where the court is concerned with the construction of a written instrument, the intention must be determined from the language of the instrument and the circumstances sur-rounding its execution. In construing the trust the intention of the settlor at the time of its creation is controlling.

And we note in 13 Tex.Jur.2d, § 113, Contracts:

A contract must be read, considered, and construed as an entirety, so that all provisions of the agreement will be taken into consideration and construed together to ascertain the meaning and effect of the instrument. In other words, the entire instrument, taken by its four corners, must be read and considered to determine the true intention of the parties. Therefore, as a general rule it will not be proper to rely on a single clause or paragraph alone, when attempting to ascertain the meaning of the agreement. On the contrary, each clause or paragraph must be construed with reference to every other paragraph, so that the effect of one paragraph on the other paragraphs may be clearly determined. Furthermore, no presumption may be predicated on a particular provision if the presumption is at odds with the effect of the other provisions of the agreement. However, the intent of the parties concerning a particular matter may be determined from one paragraph only if it appears that that paragraph alone deals with the matter, and that the remaining provisions of the contract are concerned with completely different matters.

When applying the principles set forth above, the presumption that every provision in the agreement was placed therein for a particular purpose must always be kept in mind. The court has no right to nullify any terms of the agreement, on the contrary, where possible a construction should be placed on the agreement that will give effect to all of its provisions, so as to avoid the adoption of a construction that would render any provision meaningless. Universal C. I. T. Credit Corp. v. Daniel, 150 Tex. 513, 243 S.W.2d 154 (1951).

The Supreme Court stated in Cutrer v. Cutrer, 162 Tex. 166, 345 S.W.2d 513, 86 A.L.R.2d 105 (1961), that it must seek the intention of the settlor of a trust as it existed at the time the trust was created. "Where as here the court is concerned with the construction of a written instrument and the right to reformation, recission or other equitable relief is not in issue, the intention of the parties must be determined from the language of the instrument and the circumstances surrounding its execution."

The Agreement provides in paragraph 1. that the plan for maintenance of the areas conveyed to the trustees shall terminate not later than June 30, 1969, but we find no direct connection between the date of termination of the trust and the building and use restrictions. The only direct statement as to the duration of such restrictions is found in item 17, which states in part: "No business house or houses, * * * shall ever be erected on any part of said land, * * *" This provision for unlimited duration of the restriction would not be controlling if Mr. Cullinan had elsewhere fixed a date of termination of the restrictions. In that event we would interpret item 17 as meaning that no business house should ever be erected while the restrictions were in effect.

But there is no express provision in the Agreement for a termination date of the restrictions. In the case of Morton v. Sayles, 304 S.W.2d 759 (Tex.Civ.App., 1957, writ ref., n. r. e.), it was held that restrictions whose duration was not expressed were covenants running with the land and were to run forever.

Defendants assert that the entire Agreement should be considered as a trust and thus all its provisions governed by the time limitations of the trust. A closely related problem is that of determining whether Mr. Cullinan's intention in having this instrument prepared (with his attorney's advice) was to set up his comprehensive plan for the development and enjoyment by the owners of the lots in Shadyside subdivision as a trust with all its provisions to terminate with the trust. Or did he cause trust provisions and restrictions to be mingled in contemplation that the trust would expire but the restrictions would not? It is clear that he understood that a trust could not endure forever. Did he intend in paragraph 17 to nullify the meaning of the words "no business house or houses shall ever * * *" simply because he included such restrictions in an instrument largely concerned with trust provisions? We think he did not. He seems to have been articulate and could have used words such as "so long as this trust shall endure" if he had wanted to thus limit the duration of the restrictions.

The Agreement Creating Shadyside begins: "THIS TRUST AGREEMENT AND CONVEYANCE * * *" This sounds like Mr. Cullinan had in mind only a trust indenture, but the purpose clause (paragraph D) of the Agreement recites that the Grantor: 1) has determined that the property in question shall be subdivided in a certain described way, 2) is "desirous of making provisions for administration of the properties, 3) and of creating certain restrictions in regard to the lots therein."

Attention is called to the recital in the granting clause (paragraphs E, F and G) that the conveyance of certain areas to the trustees is for "as long as this Trust shall endure"; also to the fact that there is excepted from the conveyance to the trustees and reserved to the grantor title to each of the twenty-four lots designated on an attached plat and in respect to said lots restrictions are to be provided.

The habendum clause (paragraph H) states that the land subject to the trust is to be held by the trustees "so long as this trust shall endure"; and recites "all, however, to be so held in trust for the uses, intents and purposes, and subject to the terms, restrictions, and conditions hereof as follows: * * *" Defendants,

appellees here, assert that the latter provision means that the terms, restrictions and conditions "hereof" are to be concurrent with the duration of the general plan or scheme ("so long as the trust shall endure"). We believe that paragraph H merely provides that the trustees are to hold the described premises (the lots were excluded) in trust subject to the nineteen provisions which are then listed and that they are to do so for so long as the trust shall endure. Paragraph H does not limit the term of the restrictions, but it makes the trust subject to them while it is in effect.

Defendants assert that the provision in paragraph 18 that it shall be lawful for the said "Trustees for the time being" to prosecute proceedings in support of the covenants, conditions or restrictions of the Agreement merely refers to those trustees who are then in office and permits them to enforce the Agreement. We hold that this provision indicates that the settlor intended for the trustees to have access to the courts in their capacities as trustees while the trust was in effect to enforce the Agreement. A trustee who did not own a lot could not enforce restrictions in the absence of such authorization. Wald v. West MacGregor Protective Association, supra.

No time limitation is expressed in paragraphs 9, 10, 11 and 12. The holding in Morton v. Sayles, supra, which we have quoted, is applicable here. We believe that the requirement in paragraph 10 that construction be begun within two years was intended to apply only to the original sales by the subdivider.

Most of the Agreement is concerned with the details of the trust, but building and use restrictions do not require lengthy provisions. We think that Mr. Cullinan intended to create a trust which would last for as long as the law would permit, plus restrictions whose duration would not be limited by the rule against perpetuities.

■ We sustain plaintiffs' first point.

Plaintiffs' second point of error reads:

Error of the Court in failing to consider, in arriving at its construction of the Agreement Creating Shadyside, and related original deeds, parol or extrinsic evidence for the purpose of applying the language to the surrounding and existing circumstances and to the subject matter with which the Agreement dealt, in order to determine the intent of the parties to the Agreement on the matters in controversy.

We have indicated in this opinion that we have taken into consideration evidence of the circumstances surrounding the execution of the Agreement and evidence concerning the property to which it applies. The admissibility of this type of evidence does not seem to be in doubt if the instrument in question is ambiguous on its face. The plaintiffs assert that although the instrument is not ambiguous such evidence is properly considered for the limited purpose of aiding the court in the construction of the Agreement.

Texas authorities seem not entirely consistent on this point. In Guardian Trust Co. v. Bauereisen, 132 Tex. 396, 121 S.W. 2d 579 (1938), no suggestion is made that the agreements were ambiguous, and it was held: "It is proper to consider parol testimony as to the circumstances surrounding the parties out of which the contracts grew, not to add to or vary their terms, but to apply the contracts to the subjects with which they deal for the purpose of ascertaining the real intention of the parties." Note that Ryan v. Kent, 36 S.W.2d 1007 (Tex.Com.App., 1931, judg. adopted), is cited as authority for this point.

But in Anderson and Kerr Drilling Co. v. Bruhlmeyer, 134 Tex. 574, 136 S.W.2d 800, 127 A.L.R. 1217 (1940), the case of Ryan v. Kent is cited as authority for the statement that when an instrument is ambiguous the intention is to be ascertained

not solely from the words of the instrument, but from the language when read in the light of the circumstances surrounding the transaction. The opinion then states, however, that such rule plainly implies that when the instrument is not ambiguous, the intention of the parties is to be ascertained by the court as a matter of law from the language used in the writing and without aid from evidence as to the attending circumstances. Ryan v. Kent, supra, holds, however, that in ascertaining the parties' intent (mineral lease) we may look to the surrounding circumstances when the contract was entered into, the situation of the parties, and of the subject matter of the instrument, and this regardless of whether the language used in said contract be ambiguous. The opinion explained that the effect of the evidence was not to vary the language employed, but merely to explain the sense in which the writer understood it.

Gibson v. Turner, 156 Tex. 289, 294 S.W.2d 781 (1956), cites Ryan v. Kent, supra, in admitting evidence as to the striking of certain clauses from a lease even though it was not ambiguous.

We have already quoted from Cutrer v. Cutrer, supra, on this point.

We have held in Pardo v. Southampton Civic Club, 239 S.W.2d 141 (Tex.Civ.App., 1951, writ ref.), and in Wald v. West MacGregor Protective Association, supra, that such parol evidence is admissible to show intent of the grantor in the construction of restrictions.

"On principle, every writing should be read in the light of conditions and events bearing on its origin, no matter how clear it seems in the abstract. Indeed it cannot be considered in a void, as if it had no factual context." 2 McCormick and Ray, Texas Law of Evidence 536, § 1685 (2d ed. 1956).

In Spence & Howe Construction Co. v. Gulf Oil Corp., 365 S.W.2d 631 (Tex. Sup.1963), a case in which the contract in question was not found to be ambiguous, it was held that consideration may be given to the subject matter of the contract and the surrounding facts and circumstances, not for the purpose of varying or adding to the contract but in order to find out the intention with which words are used.

■ We sustain plaintiffs' second point.

Plaintiffs' third point is:

Error of the court in finding and holding that, if it was correct in its conclusion that the restrictions terminate on June 30, 1969, the Agreement Creating Shadyside And The Related Deeds to Lot Owners did not provide for amendment, alteration or extension of such restrictions by action of the owners of only a majority of lots in Shadyside.

Plaintiffs state that they raise this point only in the event their first point is overruled. Defendants' second counterpoint asserts that the judgment of the trial court was correct in so holding. Defendants' submission of this point is not conditioned on our ruling on plaintiffs' first point. We are of the view that the judgment was correct on this point.

Defendants' other two counterpoints are directed to the same holdings as plaintiffs' points (in different order), so our rulings on plaintiffs' points constitute an overruling of defendants' first and third counterpoints.

### Defendants' Appeal

Certain defendants have filed their cross-appeal from the holdings in the trial court's judgment: 1) that the use and building restrictions applicable to Shadyside would not now be unreasonable if the Agreement Creating Shadyside were to be legally construed to provide for restrictions of perpetual or indefinite duration, and 2) that such restrictions are enforceable in all respects until their termination on June 30, 1969.

Defendants assert that the declarations of which they complain are in the nature

of advisory opinions and are beyond the proper scope of the judgment. We hold that the first declaration in question is a finding of fact and the second is a conclusion of law by the trial judge, who being mindful of the advantage in having sufficient findings so that this cause could be disposed of on appeal without a remand, incorporated them in the judgment.

Defendants also state that such declarations depend in part on assumptions which are either inconsistent with the major portions of the judgment or with the facts. We have carefully reviewed the judgment and the evidence, and we overrule both of defendants' counterpoints. We conclude that there is sufficient evidence to support the trial court's finding that the restrictions would not now be unreasonable if the Agreement were to be construed to provide for their perpetual duration. Sayles v. Morton, supra. However, we hold that the effect of the trial court's declaration recited in defendants' second point or error is that such restrictions are enforceable until June 30, 1969, in the absence of any waiver, abandonment or material change of conditions affecting Shadyside.

The judgment of the Trial Court with respect to the questions raised on this appeal by plaintiffs, Lloyd H. Smith et al, as to the duration of the restrictions and as to the considering of parol or extrinsic evidence is reversed and rendered; the judgment with respect to the questions raised by defendants, Weaver Moore et al, is affirmed.

On Motions for Rehearing

While we stated in our original opinion: "We think that Mr. Cullinan intended to create a trust which would last for as long as the law would permit, plus restrictions whose duration would not be limited by the rule against perpetuities", it would be more accurate to state: We think that Mr. Cullinan intended to create a trust whose duration was within the limits prescribed by the rule against perpetuities and also restrictions whose duration would not be so limited.

The motions for rehearing are overruled.