**Weaver MOORE et al., Petitioners,**

**v.**

**Lloyd H. SMITH et al., Respondents.**

**No. B–891.**

Supreme Court of Texas.

June 25, 1969.

Rehearing Denied July 30, 1969.

Williams, Lee & Lee, James W. Lee and Jesse J. Lee, Cleaves & Cleaves, Wilbur S. Cleaves, Butler, Binion, Rice, Cook & Knapp, Jack Binion, William C. Perry and Claude C. Roberts, Houston, John W. Stayton, Austin, for petitioners.

Hutcheson, Taliaferro & Grundy, Thad Hutcheson, John D. Roady, and Thomas N. Crowell, Houston, for respondents.

CALVERT, Chief Justice.

The respondents, as plaintiffs, sought a trial court judgment declaring that certain

building and use restrictions imposed by a written instrument on lots in "Shadyside", an exclusive residential subdivision of the City of Houston, were of permanent or indefinite duration, and, alternatively, for other relief, the nature of which is unimportant to our decision. Petitioners, as defendants, sought a judgment declaring that the restrictions would terminate on June 30, 1969, and, alternatively, that they were invalid, ineffective and unenforceable.

The trial court rendered judgment on August 4, 1966, declaring that the restrictions would expire automatically on June 30, 1969. The judgment also declared that the restrictions were not otherwise invalid, unreasonable or unenforceable. The plaintiffs appealed to the court of civil appeals where their principal complaint related to the trial court's declaration that the restrictions would expire. The defendants filed a cross-appeal in which they complained of those portions of the judgment which declared the restrictions valid and enforceable until they expired.

The court of civil appeals reversed that part of the trial court's judgment which declared that the restrictions would expire on June 30, 1969, and rendered judgment that they are of perpetual or indefinite duration; expressly affirmed that part of the judgment declaring the restrictions to be valid and enforceable until June 30, 1969; and purported to reverse the trial court's judgment in another respect to be mentioned later in this opinion. 425 S.W.2d 856. As the case reaches this court, the principal question to be decided is whether the restrictions will expire automatically on June 30th. We hold that they will not.

Shadyside was developed by J. S. Cullinan, a prominent Houston business and civic leader, and was created by a written instrument executed on July 1, 1919 by Cullinan, as grantor, and by W. W. Moore, Henry Stude and H. A. Kipp, as trustees. The instrument is quoted in full in the opinion of the court of civil appeals. 425 S.W.2d 857–861. Only those provisions deemed to be important to our decision will be quoted in this opinion.

The instrument is captioned, "Agreement Creating Shadyside". It contains eight unnumbered paragraphs, followed by nineteen numbered paragraphs which are followed, in turn, by two more unnumbered paragraphs. The opening sentence of the first unnumbered paragraph begins with this language: "THIS TRUST AGREEMENT AND CONVEYANCE * * *." The second and third paragraphs are unimportant to our decision. The fourth unnumbered paragraph recites that the grantor as owner of certain land has subdivided it into residence lots, roadways, etc., as shown on an attached map, and that he is desirous of "making provisions for administration of the properties and of creating certain restrictions in regard to the lots therein." The attached map or plat depicts 24 lots, lettered A through X, ranging in size from 6/10ths of an acre to more than 5 acres, with each lot containing a delineated building space and planting areas. The fifth unnumbered paragraph is the granting clause of the instrument. It recites that "in consideration of the premises" and "for the further purpose of creating a Trust as hereinafter defined," the grantor does grant, bargain, sell and convey "unto the said Trustees above named, and to their successors as such * * * as long as this Trust shall endure, subject in all respects to the further terms of this instrument, all and singular the following property, to wit: [Here follows in unnumbered paragraphs 6 and 7 a description of tracts of land of 36 and 1.1 acres, respectively.]" The description of the 1.1 acre tract in unnumbered paragraph 7 is followed by this proviso:

"* * * provided, however, that of said property there is excepted from this conveyance and reserved to the Grantor, title to each and all of the twenty-four lots designated by letters upon said map from A to X, both inclusive, but in respect to such lots certain restrictions are provided and shall apply as hereinafter set forth."

The eighth unnumbered paragraph is in the form of an habendum clause. It recites that the premises are to be held by the "Trustees, their successors and assigns * * * so long as this Trust shall endure; all, however, to be held in Trust for the uses, intents and purposes, and subject to the terms, restrictions, and conditions hereof as follows:"

The first numbered paragraph limits the life of the trust. It reads:

"1. This Trust shall endure during the lifetime of the survivor of the three Trustees named herein, and for twenty-one years thereafter; not, however, to exceed the period ending June 30, 1969."

Paragraphs 2, 3, 4, 5, 6, 7 and 8 prescribe the duties of the trustees with respect to the property conveyed; provide for the appointment and qualification of successor trustees; designate the lot owners as beneficiaries of the trust, and define their rights and obligations with respect to the property in the trust. Paragraph 9 directs attention to the fact that each lot contains a delineated building space and a separately designated planting space, and provides: "[A]ll buildings and other overhead structures shall in every case be confined to such Building Space, and no such shall be erected on the Planting Space." Paragraph 10 provides:

"10. There shall be but one home erected on each lot, the construction of which shall be commenced within two years from the date of the sale of such lot."

Paragraph 11 authorizes the trustees to eliminate building lines if an owner of two or more lots wishes to use them as a single residence site. Paragraph 12 prescribes a limited area, five feet in width, in which poles, lines and overhead wires may be erected, and continues: " * * * but no such shall be permitted on any other portion of said premises; but in lieu of such, underground conduits for wires, and pipes for water, gas, etc., shall be provided and located on each lot in the space reserved therefor * * *." Paragraphs 13, 14, and

15 provide that the trustees may become lot owners, and that they may charge to lot owners expenses legally incurred against the properties, but that they may not by their contracts bind themselves or the other lot owners personally. Paragraph 16 makes the right to use the property conveyed in trust an easement appurtenant to each lot. Paragraph 17 reads:

"17. No business house or houses, saloon, hospital, public boarding house, place of public entertainment, store, livery stable, or other place of business or public resort, shall ever be erected on any part of said land, nor shall any telegraph, telephone or electric light poles or overhead structures ever be erected on any part of said property except on a space five feet in width along the West line of the larger tract."

Paragraph 18 provides that if the grantor or any of the lot owners shall infringe or omit to perform "any of the covenants, conditions, or restrictions * * * relating to such lots or to any other premises herein described * * * it shall be lawful for the Trustees for the time being * * *" to file and prosecute injunction or damage suits for themselves or on behalf of the lot owners. Paragraph 19 provides that the title to all property in the trust shall, upon termination of the trust, vest in the City of Houston for the benefit of the public, unless the trustees, by direction of a majority of the lot owners, shall provide otherwise.

The first unnumbered paragraph following the nineteen numbered paragraphs authorizes the trustees and their successors to employ collectors, accountants and other agents at the expense of the trust, and provides that each trustee shall be liable only for his own willful defaults. The second such unnumbered paragraph is the attestation clause.

The instrument and the map were recorded in the office of the County Clerk and all conveyances of lots in the subdivision were made with reference thereto.

Petitioners do not contend, but expressly disavow any contention, that the twenty-four lots on which the building and use restrictions are imposed are a part of the trust res. They thus recognize that the effect of the exception and reservation quoted above from unnumbered paragraph 7 was to place in the trust, as a part of the trust res, only the roadways, sidewalks, esplanades, etc. What petitioners do contend is that the written instrument, when viewed and considered from its four corners, clearly discloses that it was the intention of Cullinan, the grantor-trustor, to create a "general plan or scheme for the development, use, maintenance and management of Shadyside as a residence area" for a limited period of time, and thus that the restrictions on lots, although not a part of the trust or governed by the trust provisions, should, nevertheless, terminate when the trust and the trust provisions terminate. The trial court agreed with this contention. The court of civil appeals disagreed with it. We disagree with it and agree with the court of civil appeals.

■ The intention of the grantor-trustor, Cullinan, to restrict the lots against use for business or commercial purposes in perpetuity or indefinitely is clearly evidenced by the language of paragraph 17. He said, in effect, that the lots in Shadyside should *never* [1] be used for business or commercial purposes, and that no utility poles or lines should "*ever* be erected on any part of said property" except in a particular space, five feet in width. How he could have expressed an intention to prohibit use of the lots for business or commercial purposes in perpetuity or indefinitely in language which was plainer, less ambiguous, or more positive, can hardly be imagined. We have held that, in interpreting a written instrument, the language used by the parties to the instrument will be given its plain grammatical meaning unless it appears that to do so will defeat the intention of the parties as clearly evidenced by other provisions of the instrument. Fox v. Thoreson, 398 S.W.2d 88, at 92 (Tex.Sup.1966). A careful analysis of the other provisions of the instrument before us does not disclose a different intention from that so clearly expressed by the language of paragraph 17. To the contrary, the other provisions of the instrument lend support to that expression of intention; and, while the other building and use restrictions contained in the instrument are not made perpetual in express language, we are satisfied that they were also intended by Cullinan to be of perpetual or indefinite duration. Among the latter restrictions are those contained in paragraphs 10 and 12 providing that only one home may be erected on each lot, and that, except in a space five feet in width, all conduits for electric lines and pipes for water, gas, etc., must be buried.

Cullinan quite obviously blended both trust provisions and property restrictions into one instrument. He declared, however, that in so doing, he had two purposes: (1) to make "provisions for administration of the properties," and (2) of "creating certain restrictions in regard to the lots therein." He thus indicated that the trust provisions and property restrictions were to exist separately. The life of the trust and its provisions were expressly limited by paragraph 1 to a minimum of twenty-one years and a maximum of fifty years. No such express provision limited the life of the restrictions, although it would have been a simple matter in writing paragraph 1 to limit their life also. To the contrary, an intention was declared in the instrument that the restrictions should "apply as hereinafter set forth," and the restrictions thereafter set forth are unlimited or are expressly made perpetual. The very wording of paragraph 1 indicates that the limitation therein contained was intended to make certain that the trust would not violate the rule against perpetuities. There was no similar reason for limiting the life of the restrictions. All of these considerations point to only one reasonable conclusion and that is that the parties to the instrument creating Shadyside

---

1. Emphasis ours throughout.

did not intend that the building and use restrictions imposed on the lots should expire with expiration of the trust.

As indicating that it was Cullinan's intention that the property restrictions should terminate when the trust terminates, petioners point to these principal considerations: (1) the phrase "This Trust" as used in the agreement is "intended to refer to the general plan or scheme" disclosed by the instrument; (2) the arrangement of the various paragraphs indicates that the limitation contained in paragraph 1 was intended to apply to the entire plan or scheme of development; (3) the provision for eliminating building lines between lots where the owner of two or more lots wishes to combine them for building one residence, can no longer be given effect after the trust terminates; (4) the provision requiring that a home be erected on a lot within two years after its purchase indicates a limited plan or scheme for development; (5) a provision authorizing the granting of utility easements by the trustees will be nullified when the trust expires; (6) a provision for improvement by the trustees of streets, sidewalks, parkways, etc., and for collecting the cost thereof from the lot owners will be nullified with termination of the trust; and (7) the authority given the trustees to sue to enforce the covenants, conditions and restrictions and to recover damages for their breach indicates a general plan or scheme for the entire project. We do not agree that these considerations furnish a reasonable basis for holding that Cullinan intended the building and use restrictions to terminate when the trust should terminate. To hold with petitioners would require that the restrictions be limited by implication squarely in the face of the provisions of paragraph 17 for perpetual restrictions. It is nearly always possible to find some provision in a lengthy written instrument which seems to some extent to be out of harmony with the main thrust of the instrument, but such provision or provisions should not be permitted to obscure the otherwise clearly indicated intention of the parties to the instrument. We

conclude that the building and use restrictions imposed by the written instrument in question on the lots in Shadyside will not expire on June 30th, but are of permanent and indefinite duration.

◼ Petitioners also contend before this court that restrictions which limit the use of a lot to one single family dwelling permanently, particularly when the lot is as large as those in Shadyside, are unreasonable restraints on the use and alienation of property and are, therefore, void and unenforceable. They say that this court has not passed directly on the question, and that contrary holdings by the courts of civil appeals are generally dicta. For such holdings, see State v. Reece, 374 S.W.2d 686 (Tex.Civ.App.—Houston 1964, no writ); Cornett v. City of Houston, 404 S.W.2d 602 (Tex.Civ.App.—Houston 1966, no writ); Logan v. Bush, 220 S.W.2d 669 (Tex.Civ. App.—Galveston 1949, writ ref'd n. r. e.); Abernathy v. Adoue, 49 S.W.2d 476 (Tex. Civ.App.—Beaumont 1932, no writ). In Morton v. Sayles, 304 S.W.2d 759 (Tex.Civ. App.—Eastland 1957, writ ref'd n. r. e.), the court held that restrictions limiting use of property to residential purposes, and containing no provision limiting the life of the restrictions, would "run forever" rather than for a reasonable time. We are not prepared to hold that restrictions which limit the use of property to residential purposes permanently or indefinitely are void and unenforceable per se. The general rule seems to be otherwise. See 20 Am.Jur.2d 748, Covenants, Conditions, etc., § 183. As to these particular lots, the trial court found as a fact, as pointed out by the court of civil appeals, that limitation of their use for a single residence permanently was not at this time unreasonable. The finding is not attacked as being without support in the evidence.

In the course of its judgment, the trial court recited that the "meaning, interpretation and construction" of the instrument creating Shadyside could be and had been "resolved and determined by the Court by consideration of Said Instrument as a

whole, and without resort to extrinsic or parole [sic] evidence," and that the court found, adjudged and declared "that the intent with respect to any such matter" was "manifested by and from within Said Instrument itself." The court of civil appeals interpreted this language to mean that, since the trial court found the written instrument to be unambiguous, parol evidence of facts and circumstances surrounding execution of the instrument could not be considered in its interpretation. The court of civil appeals then held that such evidence could and should be considered in interpreting the instrument, even though the instrument was held to be unambiguous, and proceeded to reverse the trial court's judgment in this respect and to render a declaratory judgment that such evidence could be considered in ascertaining intention. See 425 S.W.2d 864–866.

 We have no occasion to differ with the holding of the court of civil appeals concerning the right or duty of the courts below to consider evidence of surrounding facts and circumstances in interpreting the Shadyside instrument. However, we differ with the court concerning the right or duty of the courts to render a judgment declaring what evidence can and cannot be considered in a declaratory judgment action. Matters which may be the subject of declaratory judgments are itemized in Article 2524–1, Vernon's Texas Civil Statutes, as "rights, status, and other legal relations." What evidence can or cannot be considered, in the course of determining the "rights, status and other legal relations" of litigating parties, cannot be the subject of a declaratory judgment.

The judgment of the court of civil appeals is modified to eliminate therefrom the declaration concerning consideration of parol or extrinsic evidence, and, as thus modified, the judgment of the court of civil appeals is affirmed.

HAMILTON, J., dissenting, joined by SMITH and GREENHILL, JJ.

McGEE, J., not sitting.

HAMILTON, Justice (dissenting).

I respectfully dissent.

At issue in this case is the construction of this "Agreement Creating Shadyside," which was filed for record in the Harris County Clerk's office on September 29, 1919. Since any decision in this case must hinge on an interpretation of this instrument's content and format, it here seems appropriate to set it out in full:

## "AGREEMENT CREATING SHADYSIDE

"THIS TRUST AGREEMENT AND CONVEYANCE, made at Houston, Texas, as of date July 1, 1919, between J. S. CULLINAN, a citizen and resident of Houston, Texas, (hereinafter called Grantor) party of the first part;

"W. W. MOORE, HENRY STUDE and H. A. KIPP, all citizens and residents of Houston, Texas (hereinafter called Trustees) parties of the second part, and

"CERTAIN BENEFICIARIES, who are now or shall hereafter become parties hereto in the manner as herein provided, (hereinafter called Lot Owners) parties of the third part.

"WHEREAS, said Grantor is possessed and seized in fee simple of two certain tracts of land, hereafter to be known as SHADYSIDE, situated within corporate limits of the City of Houston, being hereinafter fully described, and which said Grantor has determined shall be subdivided into residence lots, roadways, etc., with characteristics as shown upon the map thereof, copy of which is hereto attached and made part hereof; and being desirous of making provisions for administration of the properties and of creating certain restrictions in regard to the lots therein;

"NOW, THEREFORE, in consideration of the premises and of one dollar in hand paid by the said Trustees, receipt of which is hereby acknowledged, and for the further purpose of creating a Trust as hereinafter defined, I, the said Grantor, J. S. Cullinan,

have granted, bargained, sold and conveyed, and by these presents do grant, bargain, sell and convey unto the said Trustees above named, and to their successors as such, all as joint tenants and not as tenants in common, as long as this Trust shall endure, subject in all respects to the further terms of this instrument, all and singular the following property, to-wit: Two tracts of land situated within the corporate limits of Houston, Harris County, Texas:

"FIRST TRACT: Consisting of about thirty-six (36) acres of the Jos. Gamble Survey, fully described in a deed to said Grantor, recorded in Book 359, page 330 of Deed Records of said County;

"SECOND TRACT: One and one-tenth (1.1) acres of the O. Smith Survey, being fully described in a deed to said Grantor, recorded in Book , page , of the Deed Records of said County; to which deed and the records thereof reference is hereby made for precise description; provided, however, that of said property there is excepted from this conveyance and reserved to the Grantor, title to each and all of the twenty-four lots designated by letters upon said map from A to X, both inclusive, but in respect to such lots certain restrictions are provided and shall apply as hereinafter set forth. (There is also excepted from this conveyance the strip of litigated land which, under terms of Grantor's purchase, he became entitled to acquire when his grantors shall have established their claim to the same.)

"TO HAVE AND TO HOLD, all and singular the above described premises, together with all improvements and appurtenances thereto incident and belonging unto the said Trustees, their successors and assigns, as joint tenants and not as tenants in common, as aforesaid, and to their proper use and behoof so long as this TRUST shall endure; all, however, to be so held in trust for the uses, intents, and purposes, and subject to the terms, restrictions, and conditions hereof as follows:

"1. This Trust shall endure during the lifetime of the last survivor of the three Trustees named herein, and for twenty-one years thereafter; not, however, to exceed the period ending June 30, 1969.

"2. The beneficiaries hereunder are those who now or may hereafter own one or more of the lots in SHADYSIDE, such lots being twenty-four in number, each designated with a letter of the alphabet serially from A to X, both inclusive; and in all things pertaining to this Trust one vote shall be allowed to the owner thereof of each such lot, and in every instance a majority of the votes shall prevail. All rights as a beneficiary hereunder shall pass with title and as incident thereto without further acts of any parties.

"3. The duties of Trustees shall be to hold title to and administer the properties vested in them, and to keep proper records and accounts of all things pertaining to the Trust.

"4. The Trustees severally shall hold their positions as such until their respective successors shall be properly designated and qualified. Vacancies shall be created by death, resignation, or removal of residence from Harris County. Upon occurrence of any vacancy, a successor Trustee shall be named by the remaining Trustee or Trustees by instrument in writing duly acknowledged for record, and if expedient such shall be signed by the old Trustee, and must be signed by the successor as well as by the other or others, and such signature by the successor Trustee shall constitute qualification and thereupon he shall succeed to every right, interest and authority of his predecessor, to the same effect as if named as one of the original Trustees.

"5. The wishes of a majority of Lot Owners (counting one vote for each lot) expressed in writing, or otherwise, shall be binding upon the Trustees in the matter of naming successor Trustees and upon any question of policy which may arise in the administration of the Trust. If all positions of Trustees should become vacant, the

Lot Owners shall have authority in like manner in writing to name successors.

"6. The Trustees shall act by majority, and may appoint officers and agents, and define and delegate the duties of such, and make provision for expenditure for the benefit of the Trust any moneys which may come into their hands in any manner.

"7. By ownership of or succeeding to title to a lot, such owner shall thereby become a beneficiary and party herein, and be deemed thereby to have promised and shall become liable to pay to the Trustees any and all such assessments as they may from time to time levy upon the lots in raising funds for the purposes of the Trust, and all such shall be deemed part of the purchase money for such lots respectively, and the same shall stand as security therefor pro rata, and each lot and owner thereof to be thus liable for one twenty-fourth of the whole amount or amounts which shall from time to time be so levied.

"8. Trustees shall have control and direction of all the roadways, sidewalks, esplanades, or other areas to which they hold title, and may direct and prescribe the character, construction, and maintenance of all improvements thereon, consisting of planting, paving, curbing, sidewalks, street lighting, or other kinds.

"9. Upon each of the several residence lots is a central or interior area, separately colored upon the map, which shall be deemed the Building Space, and coincident with the outer lines and around such building space, and otherwise colored on said map, as a Planting Space; the dimensions of said Building Space and Planting Space being further shown in feet. All buildings and other overhead structures shall in every case be confined to such Building Space, and no such shall be erected on the Planting Space.

"10. There shall be but one home erected on each lot, the construction of which shall be commenced within two years from the date of the sale of such lot.

"11. Where the owner of two or more lots desires to use them for a single residence site, the Trustees are authorized to eliminate the building lines adjacent and parallel to the present dividing lines between the combined lots.

"12. Pole lines or overhead wires may be erected on a space five feet in width along the West line of the larger tract, but no such shall be permitted on any other portion of said premises; but in lieu of such, underground conduits for wires, and pipes for water, gas, etc., shall be provided and located on each lot in the space reserved therefor, as shown on the map of SHADY-SIDE, and the Trustees shall have authority to construct the same, or to grant easements and reasonable terms for all such, and provide for uses thereof. Lot owners shall in every case make provision for proper continuation of all such for use upon their own premises.

"13. The Trustees shall not have power to bind or obligate themselves or the present or future Lot Owners personally, and in every written contract into which they may enter this fact shall be appropriately recited, and such contract shall refer to the terms and limitations of this instrument in these respects, and the other party or parties to such contract shall agree not to look to such Trustees, or either of them personally, nor to the Lot Owners, or either of them personally, but to the properties only, such as may be held by the Trustees for any enforcement of such contract and the consequences thereof legally or otherwise.

"14. Any Trustee may be or become a Lot Owner and may have and exercise all privileges and benefits of such to the same extent and in the same manner as any other Lot Owner and may cease to be such, all without in any manner affecting or impairing his position as Trustee.

"15. The Trustees shall serve without personal compensation, but shall be entitled to charge against the properties any expense or liability of any kind which they

may have legally incurred, and it is expressly agreed that in no event shall any Trustee be held liable for any act or for consequences of such, provided only he shall not have so acted in bad faith.

"16. That the right and privilege to frequent, use, and enjoy the property herein conveyed shall be an easement attached to each and every of the said twenty-four plots of land, and passing as appurtenant thereto; and to be had, held, and enjoyed in the manner aforesaid, by the Owners of the said lots, as well as the person or persons from time to time owning the same, and their respective families occupying the same, provided they shall make the annual payments before provided for and observe such regulations as aforesaid, but not otherwise.

"17. No business house or houses, saloon, hospital, public boarding house, place of public entertainment, store, livery stable, or other place of business or public resort, shall ever be erected on any part of said land, nor shall any telegraph, telephone or electric light poles or overhead structures ever be erected on any part of said property except on a space five feet in width along the West line of the larger tract.

"18. IT IS FURTHER PROVIDED, DECLARED AND AGREED that if Grantor, his heirs, executors, or assigns, hereafter owning any of the said twenty-four lots, shall infringe or attempt to infringe, or omit to perform any of the covenants, conditions, or restrictions herein contained relating to such lots or to any other premises herein described, or to the use and improvement of the same, it shall be lawful for the said Trustees for the time being in behalf and for the benefit of either themselves and the owners of the said lots, or for any or either of them, to prosecute any proceedings at law or in equity against the person or persons infringing or attempting to infringe, or omitting to perform such covenants, conditions, or restrictions, and either to prevent him or them from doing so, or to recover damages or other dues for such infringements or omissions.

"19. IT IS FURTHER EXPRESSLY PROVIDED that the title to all the property included in this Trust shall, at its expiration, however terminated, be vested in the City of Houston for the use of the public, unless it shall then be otherwise provided by the Trustees, acting under the direction and by authority of the owner or owners of a majority in number of all the said lots.

"And the Trustees, and each for himself, do hereby accept the aforesaid conveyance and trust, and covenant to perform the same; provided, and it is understood, that they and their successors from time to time may employ as the expense of such Trust, such collector or accountant, or other agent or agents, as may be found necessary to attend to and perform the details of the said trusts and powers; and provided, further, that they and their successors in the said trusts shall each be responsible only for his own acts or willful defaults, if any, and not one for the other or others.

"IN WITNESS WHEREOF, the said parties have hereto interchangeably set their hands and seals the day and year first above written."

"(Sgd) J. S. CULLINAN
Grantor

(Sgd) W. W. MOORE

(Sgd) HENRY STUDE

(Sgd) H. A. KIPP
Trustees"

Witnesses:

(Sgd) B. W. WARD

(Sgd) CECILIA FINNIGAN

The issue in this lawsuit is whether the restrictions on the use of the Shadyside land contained in the above "Agreement Creating Shadyside" were intended to remain in force after June 30, 1969. Petitioners contend that the restrictions on the Shadyside land terminate on June 30, 1969. The respondents argue that the restrictions do not terminate on this date.

It appears to this writer that the determination of the issue in this case depends upon whether or not the use restrictions were intended to be part of and a res of the trust created by the agreement. If they were so intended, then paragraph 1 terminating the trust on June 30, 1969, would decide their longevity, and none of the numbered provisions would extend beyond that date. If they were not intended to be part of the trust, then the restrictive covenants here in dispute would be of perpetual and indefinite duration.

At the outset it is possible to construe the instrument as a "trust agreement and conveyance," as the parties characterize it in the first paragraph, and to this writer this construction seems the most reasonable. To wit, J. S. Cullinan as "party of the first part" is the grantor of roadways, sidewalks, esplanades, etc., to the trustees and a party to the trust agreement. The trustees as "parties of the second part" are the grantees of title to these roadways, sidewalks, esplanades, etc., and are the parties to the trust agreement obligated to enforce the provisions of the trust. The beneficiaries of the trust as "parties of the third part" are those who are now and may become lot owners in Shadyside.

The grantor's stated purposes in the fourth unnumbered paragraph are that he "has determined [that Shadyside] shall be subdivided" and is "desirous of making provisions for administration of the properties and of creating certain restrictions in regard to the lots therein." To implement this determination and these desires the grantor in the next unnumbered paragraphs makes a conveyance of the property, but reserves title to the lots, and creates a trust in the numbered paragraphs following the conveyance. In the fifth through seventh unnumbered paragraphs, the conveyance of the roadways, sidewalks, esplandes, etc., to the trustees is completed. In the seventh unnumbered paragraph the grantor reserves title to the lots, but points out that "in respect to such lots certain restrictions are provided and shall apply as hereinafter set forth." (The restrictions are later "provided" in numbered paragraphs 9, 10, 12, and 17; they are "applied" in accordance with the other numbered paragraphs, including paragraph 1.) The habendum clause directs that the trustees shall hold their title "so long as this TRUST shall endure * * * subject to the terms, restrictions, and conditions hereof as follows." This clause can be seen to end the operative terms of the conveyance; as yet no provisions governing the trust have been set forth, and no restrictions have been placed on the land.

Beginning in the nineteen numbered paragraphs following, the trust agreement between the grantor and the trust for the benefit of the lot owner is defined. The first numbered paragraph sets the termination date of the trust. The second numbered paragraph describes the beneficiaries of the trust, i. e., the lot owners, and provides that all their rights as beneficiaries of the trust will pass with title to the lots. These rights can be seen to include the enjoyment of the restrictions placed upon the Shadyside land. The subsequent numbered paragraphs describe in detail the rights and benefits that the beneficiaries of the trust are entitled to enjoy. These specifically include the use of the land conveyed to the trustees for their benefit, and the benefit of the enforcement and administration of the restrictions in the trust on the use of the land in Shadyside. At the close of the agreement, the trustees accept the aforesaid "conveyance and trust" and covenant to perform the obligations it contains. Considering the whole instrument as a conveyance and trust, it appears

to this writer that the restrictions are provisions of the trust designed for the enjoyment of the trust beneficiaries. As such, they would be limited in duration to the life of the trust as provided in paragraph 1.

It is true that nowhere does the instrument explicitly state whether or not these restrictions are to be part of the trust; and it is also true that the word "ever" in paragraph 17 might, as the Court's opinion does, be interpreted as indicating an intention that the restrictions run forever. But in view of the Court's holding that the restrictions in paragraphs 10 and 12 (in which the word "ever" does not appear) are of perpetual or indefinite duration, the presence or absence of the word "ever" cannot be seen to be of determinative effect. Hence, this writer would construe the word "ever" in paragraph 17 to mean ever during the life of the trust. This construction would be consistent with the rule that in determining the legal effect of a deed, the inquiry is not to be determined alone from a single word, clause, or part, but from the entire instrument. Dallas Joint Stock Land Bank v. Harrison, 138 Tex. 84, 156 S.W.2d 963 (1941); Reynolds, et al. v. McMan Oil & Gas, et al., 11 S.W. 2d 778 (Tex.Com.App. 1928). A further corollary to this rule is that: "It is not permissible to give controlling effect to that which creates an ambiguity." Cartwright v. Trueblood, 90 Tex. 535, 39 S.W. 930, 932, (1897); Kokernot et ux. v. Caldwell, et al., 231 S.W.2d 528, 532 (Tex.Civ. App.—Dallas 1950, writ ref'd). In sum, this writer believes this is the sort of case the court was faced with in Universal CIT Credit Corp. v. Daniel, 150 Tex. 513, 243 S.W.2d 154, 159 (1951), when it was said "we cannot agree that this discrepancy renders the contract ambiguous in so far as the obligations of the parties with respect to this suit are concerned."

Furthermore, it has been held that when there is doubt as to an instrument's meaning, irrespective of whether or not it is ambiguous, it is proper to look to the surrounding circumstances and to the understanding of the instrument by the parties, Scott v. Walden, 140 Tex. 31, 165 S.W.2d 449, 452, 154 A.L.R. 1 (Tex.Com.App. 1942, opinion adopted); see also Murphy v. Dilworth, 137 Tex. 32, 151 S.W.2d 1004, 1005 (1941). As this Court said in City of Pinehurst v. Spooner Addition Water Co., 432 S.W.2d 515, 519 (Tex.Sup. 1968):

"Where a question relating to the construction of a contract is presented, as here, we are to take *the wording* of the instrument, *consider the same in the light of the surrounding circumstances,* and apply the pertinent rules of construction thereto and thus settle the meaning of the contract."

Indeed, the acts of the parties themselves in construing the agreement are perhaps the evidence of intention to be most heavily weighted in these cases when a question of meaning arises. The Court recognized this in Lone Star Gas Co. v. X-ray Gas Co. et al., 139 Tex. 546, 164 S.W.2d 504, 508 (1942) where it said that:

"* * * the acts of the parties themselves indicated the construction they mutually placed upon the contract at the time, including the acts done in its performance, and same is entitled to great if not controlling weight. Courts will generally follow the interpretation of the parties to a doubtful contract. The practical construction placed upon a contract by the parties themselves constitutes the highest evidence of their intention that whatever was done by them in the performance of the contract was done under its terms as they understood and intended same should be done."

In fact, this writer believes that if a reading of the trust agreement and conveyance creating Shadyside leaves doubt as to whether the restrictions in issue here are perpetual or terminate with the trust, that doubt is resolved by a document in the record signed by one of the original parties to the Shadyside agreement, W. W. Moore.

This instrument, an easement agreement with Southwestern Bell Telephone Co., dated Nov. 8, 1941, was signed by Moore twenty-five years before any dispute over the longevity of these restrictions arose. The granting of this easement by the trustees was in the performance of their duties as "provided in the trust agreement." It is undisputed that W. W. Moore was Cullinan's lawyer in 1919, and the draftsman of the "Agreement Creating Shadyside." This November 8, 1941, contract expressly states that:

"The Company shall have an easement for the full use of said telephone conduit system for the period from January 1, 1941, to the *termination of the restrictions* upon said Shadyside Addition as provided in said Agreement Creating Shadyside above referred to (which by the *terms of said Agreement will expire by lapse of time on June 30, 1969*). * * " [Emphasis added.]

The above, then, would appear to be a clear and unequivocal statement by an original trustee and the draftsman of the instrument as to his interpretation of the duration of the restrictions in the agreement here in dispute.

Finally, it seems to this writer pertinent that it has been held in this State that:

"Restrictive clauses in instruments concerning real estate must be construed strictly, favoring the grantee and against the grantor, and all doubt should be resolved in favor of the free and unrestricted use of the premises." Baker et al. v. Henderson et al., 137 Tex. 266, 153 S.W.2d 465, 470 (Tex.Com.App. 1941, opinion adopted); see also Couch et al. v. Southern Methodist University et al., 10 S.W.2d 973 (Tex.Com.App. 1928); Sumerline et ux. v. Cox et al., 344 S.W.2d 742 (Tex.Civ.App.—Eastland 1961, error ref'd).

In view of the foregoing, I would interpret the restrictions in the agreement to be limited by the terms of the trust agreement. I therefore would reverse the judgment of the Court of Civil Appeals and affirm that of the trial court.

SMITH and GREENHILL, JJ., join in this dissent.