**GULF OIL CORPORATION et al.,**
**Petitioners,**

v.

**SOUTHLAND ROYALTY COMPANY et al.,**
**Respondents.**

**No. B–3385.**

Supreme Court of Texas.

May 30, 1973.

Rehearing Denied July 25, 1973.

Ira Butler, Fort Worth, Jackson, Walker, Winstead, Cantwell & Miller, A. W. Walker, Jr., Dallas, Jesse P. Luton, Jr., Morgan

L. Copeland, and K. C. Keener, Houston, Mullinax, Wells, Mauzy & Babb, Otto B. Mullinax, Dallas, Simon & Simon, Henry Simon, Sr., Fort Worth, Arthur E. Moers, Jr., Houston, Royce H. Savage, Edwin S. Hurst, Tulsa, Okl., William L. Kerr, Midland, Ken G. Spencer, Crane, for petitioners.

Hudson, Keltner, Smith & Cunningham, Luther M. Hudson, and J. B. Cunningham, Fort Worth, Stubbeman, McRae, Sealy, Laughlin & Browder, Tom Sealy, W. B. Browder, Jr., and F. H. Pannill, Midland, Walter B. Morgan, J. Lamar Hart, and Dillard W. Baker, Houston, C. Bennett, Crane, Joseph A. Beyer, Spur, Stroud & Smith, John R. Feather, Dallas, G. Bert Smith, Jr., Andrews, Hopkins, Sutter, Owen, Mulroy & Davis, William P. Sutter, Chicago, Ill., for respondents.

REAVLEY, Justice.

This is a suit for declaratory judgment to determine the longevity of an oil and gas lease. Gulf Oil Corporation and six others filed the suit against Southland Royalty Company and eighty-seven others to resolve this controversy: Southland and other owners of the reversionary mineral interest contend that Gulf's leasehold estate expires on July 14, 1975, which is fifty years after the date of its execution, while Gulf contends that delays of its production due to proration orders of the Railroad Commission should not be counted in the fifty years to which it is entitled and that termination of the lease should not occur until 1987. When Gulf rested its presentation in the trial court, the judge withdrew the case from the jury and entered judgment for defendants (Southland). The Court of Civil Appeals affirmed, holding that the terms of the lease fix its termination date at July 14, 1975. 478 S.W.2d 583.

The lease was executed on July 14, 1925 by W. N. Waddell et al., lessors, and Gulf Production Company (corporate predecessor of Gulf Oil Corporation), lessee. It leased to Gulf 45,771 acres of land in Crane County "with the exclusive right of exploiting the same for and producing oil and gas therefrom." Gulf commenced drilling operation on the land and has conducted operations thereupon continuously to the present. At the time of the trial Gulf was operating 925 producing oil and gas wells there.

The original lease is almost entirely a printed document. The name of the lessee, Gulf Production Company, and all of the words of the lease provisions set forth below, except for the dollar amount of delay rental and the name of the depository bank, were in the printed form that was used. The argument centers upon Section 1, Paragraph 2, which can be referred to as the habendum or term clause, and Section 7, which Southland refers to as a force majeure or excuse clause but to which Gulf gives overriding effect. The full text of these and other relevant lease provisions are here set forth.

## SECTION 1.

\*   \*   \*   \*   \*   \*

Par. 2. TO HAVE AND TO HOLD unto said Lessee and to Lessee's successors and assigns for the term of Twelve (12) years from the date hereof and as much longer thereafter as oil or gas (or other minerals, if produced hereunder) are produced from said land. Provided, that this lease shall not remain in force longer than fifty (50) years from this date, and provided further, that a temporary cessation of production due to cleaning out, working over or drilling deeper of any well, or similar causes occurring after production secured, shall not terminate this lease. And Lessor covenants that Lessor has good title to said land and will protect Lessee in the quiet and peaceable possession thereof.

Par. 3. Lessee agrees to begin operations for the drilling of a well on the premises within twelve (12) months from the date hereof, or, failing so to

do, Lessee agrees to pay in the manner below stated for each six (6) months' period for which such drilling is delayed, not to exceed eighteen (18) such periods, the sum of $5,721.37 Dollars, such payment to be made on or before the beginning of each such period and shall be made by paying the same to the Lessor in person or to the First National Bank of Ft. Worth, Texas, or Lessee may mail Lessee's check to Lessor in said sum in care of said Bank, payable to Lessor, said Bank being hereby constituted Lessor's agent to receive said funds for Lessor or to receive and deliver said check to said Lessor, as the case may be; in either of the three methods of making such payment Lessee may use Lessee's check and the mailing of said check shall be deemed making payment; if Lessee shall fail to make such payment in advance as above provided, and such failure or default shall continue for thirty (30) days after the due date of such payment, Lessor shall have the right to forfeit this lease.

\*    \*    \*    \*    \*    \*

Par. 5. If while this lease is in force as herein provided, Lessee shall have begun operations in attempt to find oil or gas, then, without making any further payments Lessee may continue such attempt, and may make as many attempts as Lessee pleases; but if Lessee shall abandon such attempts for ninety (90) days without finding oil or gas in paying quantities, Lessee shall resume payment of the rentals falling due after the completion or abandonment of such well, at the next ensuing rental period beginning after such completion or abandonment; provided Lessee shall have at least ninety (90) days from the date of such abandonment of operations in which to make such payment and on resuming payment of rentals Lessee shall have the right to continue making the same or of beginning operations for the drilling of a well and to alternate such rights.

Par. 6. If operations shall not be begun on or before the expiration of ten (10) years from this date, this lease shall wholly terminate, but if, prior to the termination of such ten (10) years, Lessee shall have begun operations in attempt to find oil or gas and is engaged in such operations at the end of the ten-year period, then Lessee shall have the right to continue such operations and also to make as many additional attempts to find oil or gas as Lessee desires beyond the expiration of said ten-year period; provided, however, that these attempts so extending such rights beyond such ten years must be successive in the sense that, until oil or gas be found in paying quantities, not more than sixty (60) days shall elapse between the abandonment of work on one well and the beginning of operations on another, and provided further that this right to make attempts before the discovery of oil or gas shall not continue in any event longer than twelve (12) years from the date hereof.

\*    \*    \*    \*    \*    \*

## SECTION 7.

Paragraph I. When drilling or other operations are delayed or interrupted by storm, flood, or other act of God, by fire, war, rebellion, scarcity of water, insurrection, riots, strikes, scarcity of labor, differences with employees, or failure of carriers to transport or furnish facilities for transportation, or as the result of some order, requisition or necessity of the Government, or as the result of any cause whatsoever beyond the control of the Lessee, the time of such delay or interruption shall not be counted against the Lessee—anything in this lease to the contrary notwithstanding.

Under paragraphs 3 and 5 of section 1 the lessee is required to begin operations for the drilling of a well within twelve months or to pay rental (for each six months in advance). If operations have begun in the attempt to find oil and gas,

no delay rentals need be paid while the attempt continues or a new operation is begun. Lessee is allowed ninety days after the abandonment of one well in which to begin operations for the drilling of a new well or to pay delay rentals.

Under paragraph 7 of section 1 the lease terminates if no operations are begun within ten years. If the lessee has begun operations in the attempt to find oil and gas and is engaged in such operations at the end of ten years, the lessee may continue and may make new attempts following the ten year period, but no more than sixty days may elapse between the abandonment of one well and the beginning of operations on another, and no attempt prior to discovery of oil and gas may continue after twelve years.

Under the terms of this lease the lessee is, or could be, faced with a number of different time periods: (1) The "lease shall not remain in force longer than fifty years from this date"; (2) Production must be obtained within twelve years from date; (3) Within twelve months from date, and every six months thereafter through ten years if no discovery is made, either rentals must be paid or operations must be conducted for the drilling of a well; (3a) If a well is abandoned during the ten years, rentals must be paid or another well begun within ninety days; (4) Operations to find oil or gas must be begun within ten years from date; (4a) If operations are unsuccessful and the attempt is abandoned after expiration of the ten year period, operations on another well must be begun within sixty days.

■ It would be the effect of Gulf's contentions that the provisions of section 7 apply alike to each of the stated time periods and that no period (sixty days, ninety days, six months, twelve months, ten years, twelve years, or fifty years) is measured by the calendar alone, for the counting of the time of any period would be stopped so long as the lessee's operations are delayed or interrupted by any cause beyond its control. Gulf does not seek in this suit to save production time for any cause except for 4,661 days of lost production on the lease due to proration orders of the Railroad Commission during the period from January 1, 1938 through June 30, 1967. However, Gulf cannot prevail to any extent unles section 7 be construed to impose upon the fifty year limitation an interruption or extension for every cause named in section 7 which can be proved to exist or to have existed from July 14, 1925 until final termination.

Gulf has established that a substantial amount of oil production has been denied to it as the result of an order of government. In order to prevent waste, the Railroad Commission ordered all production of the wells on this land to be stopped during a total of 197 days between January 20, 1938 and March 23, 1940. Thereafter its monthly orders permitted production by most of the oil wells of their daily allowable volume, assumed to be that amount produced at the most efficient rate, for only a specified number of days of the month. However, the operator was given the choice of producing each well for the specified number of days in the month or of reducing the rate of production to a corresponding percentage to achieve the same total production for the month. In 1963 the Railroad Commission stopped using days as its measurement for this purpose and went to a percentage (the "market demand factor") which was applied to the scheduled daily allowable of each well to obtain the total production allowed. Gulf has tabulated the total days of denied production (multiplying the percentage by the days of the month to get the producing days where the order itself does not use days as the measurement) through the years from 1938 to 1967 and has arrived at a grand total of 4,661.444 days.

Gulf has *not* proved that all operations were interrupted on this lease at any time. To the contrary, it stipulated "that there was continuous drilling on the Waddell, et al, lease by Gulf from the time of com-

mencement of the drilling of the first well up to and through the present time." Gulf points to the disjunctive "or" in section 7: "When drilling or other operations are delayed . . . " etc. and argues that after production is obtained, time should not be counted for any purpose so long as *operations* are interrupted—even though drilling and other operations proceed apace. To reach that construction we are asked to reject a reasonable meaning of the disjunctive "drilling or other operations" and to give those words such effect as to exalt section 7 as regulator of a very long lasting lease. If section 7 is intended to do nothing more than save the lease for Gulf when interrupted from doing something that it is required to do by the lease (be that something drilling *or other operations*), the disjunctive is appropriate. Under Gulf's construction, every hour of every excused delay in a significant degree of its operations can be added to the fifty years before termination is finally reached. That construction would play havoc with the express proviso "that this lease shall not remain in force longer than fifty (50) years from this date."

Consider Gulf's position with reference to the wells which were not affected by the proration orders. Beginning in January 1944 Gulf enjoyed a discovery allowable because of opening a new field and by which for a limited time and for a limited number of wells no reduction was imposed on the production of the scheduled allowable for those wells. Since March 1945 it has operated marginal wells on the lease, these wells being incapable of producing more than a prescribed amount. Since 1960 Gulf has produced gas wells which are not associated with any oil reservoir. None of these wells were shut down or restricted by proration orders of the Railroad Commission. Gulf says that the production from these non-prorated wells was infinitesimal when compared with the production from the hundreds of top allowable oil wells. It proposes, however, an alternate computation of lost production if these non-pro-

rated wells are to be considered. Gulf computes the percentage of the total daily scheduled allowable for the lease as a whole which is represented by the production from the non-prorated wells. That percentage multiplied by the shutdown days of a proration period gives the time credit to be allowed. Thus 34.795 days are deducted because of marginal wells, and 64.436 days are deducted because of discovery allowable oil wells. As for the gas wells, the cubic feet of gas produced is first converted into equivalent barrels of oil displacement in an oil reservoir, and then the same computation is made as for the non-prorated oil wells, giving a credit of 177.022 days.

Gulf's computations might well offer an equitable approach by which it could be redeemed for its lost oil production—if that is what the lease provides. But the lease is silent about the lessee's rights if some of its wells are not allowed to produce to full capacity; that is, the lease is silent unless its date of termination is changed by interruption of production. The express provision for the date of termination says nothing about production; it speaks only of time and dates. Gulf's cause bears a severe impediment because of the continuous drilling and production. Could we say that while drilling operations were being conducted and operating wells were producing oil and gas, the time (term) of the lease was standing still because other wells were not producing their full allowable? We would probably not reach that result unless the language of the lease permitted no other reasonable construction. But leaving aside that question, we turn to the more fundamental inquiry: should the lease term be measured to last longer than July 14, 1975 even in the event of a complete shutdown of all drilling and operations by a cause beyond Gulf's control?

Gulf insists that the language of section 7 has that certain effect by providing that "the time of such delay or interruption shall not be counted against the Lessee— anything in this lease to the contrary notwithstanding." The final expression giving

the section priority over any contrary provision of the lease does not decide what the section means and to what it is contrary. Finder v. Nyegaard, 367 S.W.2d 217 (Tex.Civ.App.1963, writ ref'd n. r. e.). This brings us to the meaning of the language that the time of a delay or interruption "shall not be counted against the Lessee." We are not compelled to read this to say that all operational delay time shall be accumulated and then used to compute the expiration date of the fifty year term. Counting time against lessee and counting time on the duration of the term of the lease are two different matters. The former treats lessee's compliance with the performance required of it by the lease. The most reasonable interpretation of section 7 is that it excuses lessee for the failure to drill or engage in operations required by other provisions of the lease so long as the failure is due to a delay or interruption specified by section 7. For example, if the lessee were to abandon drilling in one hole during the eleventh year of the lease, by the specific provision of paragraph 6 the lease would terminate sixty days thereafter upon lessee's failure to begin operations on another well. However, if lessee's delay could be accounted for by a cause within section 7, the time of that delay would not be counted against lessee—paragraph 6 of section 1 to the contrary notwithstanding.

■■ The duration of the estate granted is traditionally determined by the habendum clause. 2 Summers, The Law of Oil and Gas, Perm.Ed. § 303.1, p. 319. This need not be the case, for the instrument may provide elsewhere for the enlargement of the term stated in the habendum. *See* Stanolind Oil & Gas Co. v. Christian, 83 S.W.2d 408 (Tex.Civ.App.1935, writ ref'd); Humphrys v. Skelly Oil Co., 83 F. 2d 989 (5th Cir. 1936). It is always a question of resolving the intention of the parties from the entire instrument. In looking to the place in this lease where we would expect to find the term stated, we find this very certain language: "Pro-

vided, that this lease shall not remain in force longer than fifty (50) years from this date . . . ." With a plain and certain answer to the question of when the lease terminates, we cannot change that answer with words elsewhere in the lease not certainly directed to the same question. Moore v. Smith, 443 S.W.2d 552 (Tex. 1969); Cartwright v. Trueblood, 90 Tex. 535, 39 S.W. 930 (1897).

The judgments below, declaring and adjudging the lease to terminate finally on July 14, 1975, are affirmed.

GREENHILL, C. J., concurs and writes opinion.

GREENHILL, Chief Justice (concurring).

I do not agree with the holding of the court that Section 7 of the lease is simply an excuse clause and would not be applicable, as relevant here, even if there had been a *complete* shutdown of all operations [for a period of years, for example] by governmental orders.