**SKYLAND DEVELOPERS, INC., et al., Appellants,**

v.

**SKY HARBOR ASSOCIATES, Appellee.**

**No. 1371.**

Court of Civil Appeals of Texas, Corpus Christi.

May 31, 1979.

Rehearing Denied Aug. 30, 1979.

Richard A. Hall, Gary, Thomasson, Hall & Marks, Corpus Christi, for appellants.

Lev Hunt, Kleberg & Weil, Corpus Christi, for appellee.

## OPINION

NYE, Chief Justice.

This is a suit to recover damages for breach of a real estate sales and management contract. The purchaser, Sky Harbor Associates, brought suit against the sellers, Skyland Developers, Inc., a Texas corporation, and Robert D. Reisinger, Robert B. Reisinger and James L. Collins, individually and d/b/a Skyland Developers, an Oklahoma partnership, to recover damages for the breach of the real estate sales and management contract executed by the parties on May 1, 1974. The contract provided for the purchaser to buy and the sellers to sell, and thereafter manage, as Purchaser's agent, a 224 unit apartment complex located on South Padre Island Drive and McArdle Street in Corpus Christi, Nueces County, Texas. After a jury trial, the court granted plaintiff's motion for judgment on the verdict and entered a judgment awarding damages of $23,061.28 to the plaintiff. The judgment also required sellers to provide plaintiff with an accounting for all income and expenses incurred in connection with the management and operation of the apartment from May 1, 1974 through December 31, 1974. Defendants appeal.

Appellants, Skyland Developers, Inc. and Skyland Developers, (hereafter called Sellers) commenced building the 224 unit apartment project in question in 1973. While the project was still under construction, Sellers entered into a written agreement which, in part, called for the sale of the project to Sky Harbor Associates (hereafter called Purchaser). Under the terms of the contract, ownership was to be transferred to the Purchaser effective May 1, 1974, but the Sellers were to complete the construction of the project and, as agent for Purchaser, were to manage the apartment house project from May 1, 1974 through December 31, 1974. As additional apartment units were completed, Sellers executed rental agreements, collected rent and security deposits, and paid the maintenance and operating expenses. At the end of December, Sellers relinquished possession and management of the apartment complex to Purchaser.

A dispute then arose concerning the responsibility for the payment of the 1974 ad valorem taxes on the property which totaled $7,311.28. Sellers did not pay the 1974 taxes. In April, 1975, after receiving a delinquent tax statement, Purchaser paid all of the 1974 taxes. In addition, a dispute arose when management and possession of the apartment complex was turned over to Purchaser, because Sellers refused to relinquish $15,750.00 which represented unrefunded security deposits they had collected

from tenants during the time they managed the complex.

The crux of the dispute between the parties concerns the following contractual provisions:

"5. *Proration of Taxes.* All general taxes, special assessments, liens and personal property taxes, if any, payable during the year 1974 shall be prorated on the basis of said calendar year between Seller and Purchaser as of May 1, 1974. If the amount of general taxes cannot be ascertained, such proration shall be on the basis of such taxes paid for the preceding year.

\*  \*  \*  \*  \*  \*

9. (ii) [Seller agrees] to exercise its best efforts to lease the apartment units as agent of Purchaser  .  .  .  for which Seller shall receive compensation equal to all income and/or cash flow generated by the Project after payment of operating and maintenance expenses other than interest on the Promissory Notes [hereinafter 'Construction Loan Interest'], which, except as otherwise provided in paragraph 11 hereof, shall be the sole responsibility and obligation to the Purchaser.

\*  \*  \*  \*  \*  \*

From May 1, 1974 through December 31, 1974 (or December 1, 1974 if construction is not completed by such date), Seller shall be entitled to all income and/or cash flow from the property and shall be responsible for payment of all expenses incurred in connection with operation and maintenance thereof, other than Construction Loan Interest, which  .  .  .  shall be the responsibility and obligation of the Purchaser to pay direct to Cousins on a current basis.

\*  \*  \*  \*  \*  \*

Income realized and expenses incurred in connection with operation of the Project shall be prorated between the parties hereto as of December 31, 1974 and an accounting shall be rendered with respect thereto on or before January 15, 1975."

Purchaser filed suit alleging that, pursuant to paragraph 9 of the agreement, Sellers were to be charged with and responsible for all operating expenses of the apartment complex, including ad valorem taxes assessed against the property for the 1974 tax year. Purchaser also alleged, in effect, that the sum retained by the Sellers representing security deposits collected from tenants was not a part of the compensation Sellers were to receive for their management services.

Sellers defended, in part, on the basis that pursuant to the terms of the contract: 1) they were not obligated to pay ad valorem taxes for the 1974 year which accrued after May 1, 1974; and 2) the retained security deposits constituted "income and/or cash flow generated by the Project" and as such, the security deposits represented part of the Sellers' compensation for managing the project. Sellers alternatively alleged that, if the contract did not specifically support their contentions, then such contract was ambiguous and should be construed to support their contentions.

In response to special issues, the jury found, in relevant part, that: 1) operating expenses for the apartment project for the period from May 1, 1974 through December 31, 1974, included real estate taxes on such apartments; 2) a sum of $4,191.61 represented the amount of real estate taxes which were part of the operating expenses during that period; 3) the unforfeited tenants' security deposits were not part of the income, as that term is used in the May 1 contract, generated by the apartment complex during the period from May 1, 1974 through December 31, 1974; 4) the unforfeited tenants' security deposits were not part of the cash flow, as that term is used in the contract, generated by the apartment complex for the same period; 5) the sum of $15,750.00 represented the amount of unforfeited tenants' security deposits as of December 31, 1974; 6) the Sellers failed to render to the Purchaser an accounting on or before January 15, 1975, with respect to income realized and expenses incurred in the operation of the apartment complex for the period of time from May 1, 1974 to December 31, 1974.

In accordance with the answers to these special issues, the trial judge entered judgment awarding Purchaser $23,061.28 which represented the real estate taxes on the property for the period from May 1 to December 31, 1974, plus the sum of $15,750.00 representing the amount of tenants' security deposits as of December 31, 1974. The trial judge refused to enter judgment awarding the Sellers $493.69 representing salaries Sellers allegedly paid by mistake for managing the project after December 31, 1974.

In points of error one through three, appellant Sellers' major complaint is that the form in which the special issues were submitted to the jury erroneously required the jury to construe the contract, rather than answer factual inquiries concerning the intent of the parties. These contentions are predicated upon Sellers' premise that "[a]mbiguities existed by virtue of the provision . . . that ad valorem taxes on the property were to be 'prorated' between the parties . . ." [Paragraph 5], and because of the provision that Sellers would receive "compensation equal to all income and/or cash flow generated by the project after payment of operating and maintenance expenses. . . ." [Paragraph 9]. Purchaser, on the other hand, contends that because the intention of the parties was not at issue, the contract was unambiguous, and thus, the trial court properly submitted issues to the jury requesting them to determine the meaning of undefined words which were used in the contract.

Our threshold inquiry is whether or not the contract in question is ambiguous. If it is not, then, even if we should agree that the form of the special issues erroneously required the jury to answer a question of law, reversible error will not be present if the trial court's judgment, based upon the jury's verdict, reaches the same result the trial judge should have reached if he had interpreted and construed the contract as a matter of law. See *Carter v. Associates Discount Corp.,* 550 S.W.2d 399, 400 (Tex. Civ.App.—Amarillo 1977, no writ); *City of Houston v. Howe & Wise,* 323 S.W.2d 134, 143 (Tex.Civ.App.—Houston [1st Dist.]

1959, writ ref'd n. r. e.); *Smith v. Smith,* 187 S.W.2d 116, 121 (Tex.Civ.App.—Fort Worth 1945, no writ). As stated by one eminent authority:

> "Absent some showing of extraneous prejudice, the submission of a question of law is harmless: if it is answered as the court should have decided, it can hardly damage; if it is answered to the contrary, the finding would be immaterial and hence should be ignored." 3 McDonald Texas Civil Practice, § 12.37, p. 1169 (1965).

As a general rule, a contract is ambiguous if its meaning is "uncertain and doubtful" or "[if] it is also subject to more than one reasonable meaning, unresolvable by rules of interpretation." *Skelly Oil Company v. Archer,* 163 Tex. 336, 356 S.W.2d 774, 778 (1962); citing *Neece v. A.A.A. Realty Company,* 159 Tex. 403, 322 S.W.2d 597 (1959) and *Universal C. I. T. Credit Corp. v. Daniel,* 150 Tex. 513, 243 S.W.2d 154 (1951). In other words, if a contract remains reasonably susceptible to more than one meaning after the established rules of interpretation have been applied, it is ambiguous. On the other hand, if only one reasonable meaning clearly emerges, it is not ambiguous. In this latter event, the contract will be enforced as written and parol evidence will not be received for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports. *Universal C. I. T. Credit Corp. v. Daniel,* 150 Tex. 513, 243 S.W.2d 154, 157 (1951).

In the interpretation of contracts, whether they are allegedly ambiguous as: 1) being susceptible to more than one reasonable meaning; or 2) containing language of doubtful meaning, "the primary concern of the courts is to ascertain and to give effect to the true intention of the parties." In order to achieve this objective, the courts will examine and consider the entire writing, seeking to harmonize and to give effect to all of the provisions of the contract, as best they can, so that none will be rendered meaningless. *Universal C. I. T. Credit*

*Corp. v. Daniel,* 150 Tex. 513, 243 S.W.2d 154, 158 (1951). See *Citizens National Bank in Abilene v. Texas & P. Railway Co.,* 136 Tex. 333, 150 S.W.2d 1003 (1941); *Nixon v. First State Bank of Corpus Christi,* 540 S.W.2d 817, 821 (Tex.Civ.App.—Corpus Christi 1976), writ ref'd n. r. e., 544 S.W.2d 378 (Tex.Sup.1977).

Under the rules of law established in the above cited authorities, we must look first to the document in question without consideration of any extrinsic evidence to determine if an ambiguity exists within the contract. As earlier stated, the Sellers relied upon two alleged ambiguities. Sellers contend the first ambiguity exists by virtue of the tax proration which requires the Sellers and Purchaser to prorate the 1974 tax liability for the apartment complex contained in paragraph 5 and the provision in paragraph 9 which required the Sellers to pay all maintenance and operation expenses of the apartment complex incurred during the period from May 1, 1974 through December 31, 1974. Second, Sellers contend, in essence, that the phrase "income and/or cash flow generated by the Project" is ambiguous because such phrase could reasonably be construed either to include or to exclude tenant security deposits which Sellers collected but which remained unforfeited as of December 31, 1974.

At the outset, we observe that the contract in question is significantly more complex than the usual contract to effectuate the sale and purchase of property. A reading of the entire document reveals that the parties actually contemplated three separate, yet interrelated transactions: 1) the purchase and sale of the apartment complex; 2) the completion of the construction of the apartment complex by December 31, 1974; and 3) the internal management of the apartment complex for the period from May 1, 1974, through December 31, 1974. In accordance with the provisions relating to these three separate purposes, Sellers had three distinct legal relationships to the Purchaser. First, the Sellers were grantors of the property and agreed to sell the apartment complex in question to Purchaser, prorate taxes to date of closing. Second, the

Sellers were to be the "general contractor of Purchaser in compliance with the terms of the Construction Loan Agreements" and were to "diligently proceed to complete construction of the Project on or before December 1, 1974." Third, the Sellers were to act as managers of the apartment complex as specified in the disputed paragraph 9 wherein Sellers agreed "to exercise its best efforts to lease the apartment unit as *agent* of Purchaser . . . until December 31, 1974. . . ."

Concerning Sellers' third legal capacity, its duties as Purchaser's leasing agent (paragraph 9), required the Seller to be responsible "for payment of *all expenses incurred* in connection with operation and maintenance . . . " of the apartment complex. Paragraph 9 further expressly provided that Sellers' compensation for executing its duties as "agent" of Purchaser would be "all income and/or cash flow generated by the Project after payment of operating and maintenance expenses other than interest on the Promissory Note (hereinafter Construction Loan Interest) . . "

■ The obvious purpose of the proration paragraph (taxes), when considering the contract as solely for the sale and purchase of property, is to apportion the tax liability for the 1974 tax year between the Sellers and the Purchaser in accordance with their respective periods of ownership during that year. Absent such a clause, the Sellers would be liable for all ad valorem taxes assessed against the property for that year. See *Dickison v. City of San Antonio,* 349 S.W.2d 640 (Tex.Civ.App.—San Antonio 1961, writ ref'd n. r. e.); Tex.Rev.Civ.Stat. Ann. art. 7151 (1962). The management portion of the contract (paragraph 9), on the other hand, obligates the Sellers to act as "agent" of the Purchaser in leasing apartments, executing leases and paying all expenses "incurred in operating and maintaining the apartment complex." The next question is whether or not taxes should be included within the purview of operating and/or maintenance expenses. We hold that it does.

In interpreting or construing a contract, the language of the contract is of the first importance. *Gallup v. St. Paul Ins. Co.,* 515 S.W.2d 249 (Tex.Sup.1974). The language used by the parties to a written instrument should be given its plain, grammatical meaning unless it definitely appears that the intention of the parties would thereby be defeated. *Fox v. Thoreson,* 398 S.W.2d 88 (Tex.Sup.1966); *Tower Contracting Co. v. Flores,* 157 Tex. 297, 302 S.W.2d 396 (1957); *General American Indemnity Co. v. Pepper,* 161 Tex. 263, 339 S.W.2d 660 (1960); *Gulf, C. & S. F. Ry. Co. v. State,* 97 Tex. 274, 78 S.W. 495 (1904), aff'd, 204 U.S. 403, 27 S.Ct. 360, 51 L.Ed. 540 (1905). If a disagreement about the use and meaning of language used in a contract arises, courts will construe what the parties said in the light that ordinary men would have used and understood such language. *Jones v. Dumas Development Co.,* 229 S.W.2d 936 (Tex.Civ.App.—Amarillo 1950, writ ref'd n. r. e.). In addition, the objects and purposes intended to be accomplished by the parties in entering the contract must be kept in mind. *Lab Oil Co. v. Bentz,* 380 S.W.2d 846, 849 (Tex.Civ.App.—Corpus Christi 1964, no writ). As stated by our Supreme Court in *Garcia v. King,* 139 Tex. 578, 164 S.W.2d 509 (1942):

> "In order to understand and properly interpret the language used by the parties we must consider the objects and purposes intended to be accomplished by them in entering into the contract."

As used in the context of this part of the transaction ("agent" of Purchaser in leasing and managing the property) the common or usual meaning of the term "operate" means "to conduct or direct the affairs of (a business, etc.); manage." Webster's New World Dictionary (2d College Ed. 1974). The term "expenses," as it is understood in its usual meaning under the circumstances in question means "charges or costs met within running a business, doing one's work, maintaining property, etc." The term "operating expenses," then, would mean those expenses incurred in the course of conducting, directing or managing the affairs of a business, such as an apart-ment complex. The term, as it is normally understood in its usual and customary sense, is, without a doubt, broad enough to encompass all expenses, including ad valorem taxes assessed against the property.

We fail to see the ambiguity which Sellers contend is created by paragraph 9 (compensation paragraph) and paragraph 5 (proration paragraph). Pursuant to paragraph 5, the parties obviously intended the Sellers to assume the responsibility for paying the ad valorem taxes in proportion to the duration of their ownership for the year 1974. Pursuant to paragraph 9, the parties intended the Sellers, as "agents" of Purchaser, to pay on behalf of the Purchaser, *all* maintenance and operating expenses of the apartment complex, including Purchaser's ad valorem tax liability. We are of the opinion that the fact that the Sellers were required to pay the tax liability in two capacities—i. e., their own individual capacity as sellers and in their representative capacity as "agents" of the Purchaser, does not render the provisions of the contract ambiguous. We pause to note that the contract (which incidentally was prepared by the Sellers), made one specific exception to the requirement that Sellers pay all operating expenses. The contract provided that the interest payment on the construction loan would be the sole responsibility and obligation of the Purchaser: to pay the amount "directly to Cousins on a current basis." We hold that paragraphs 5 and 9 are not ambiguous, and that they are subject to only one reasonable interpretation.

The second major dispute between the parties concerns the question of whether or not "income and/or cash flow generated by the Project" includes sums of money the Sellers received as security deposits when acting as agent for the Purchaser. The contract in question makes no particular reference to security deposits. Paragraph 9 of the contract does, however, specifically enumerate some of Sellers' leasing duties as "agent" of the Purchaser. Paragraph 9 required Sellers to lease each apartment for a term of not less than six months

and to obtain written leases from each tenant in a specified form which was attached to the contract as Exhibit "G." This lease form makes several references to the security deposit required by each applicant for an apartment unit. In particular, paragraph 7 of the rental agreement provides as follows:

"The applicant (tenant) understands and agrees that the security deposit will be maintained at all times to guarantee the Landlord against loss from damage, loss or rental due the Landlord, against failure to give proper vacating notice as stipulated below, or failure to leave the apartment in the same condition and as clean as when rented, ordinary wear and tear excepted, as verified by the attached inventory sheet. *Applicant understands that said deposit will be returned to a forwarding address only after all conditions have been satisfied,* the apartment has been completely vacated by the tenant and inspected by the Landlord or his agent, and all keys have been returned." (Emphasis added).

The attached inventory sheet (referred to in paragraph 7) included a schedule of "minimum charges" which would be deducted from the security deposit. It included for example: keys not returned—$5.00, general cleaning—$7.50, cleaning oven and range—$7.50, etc.

The lease form and other exhibits attached within Exhibit "G" clearly contemplate that, insofar as the contract between the Landlord and tenant was concerned, the tenant security deposits, although held by the Landlord, would be returned to the tenant upon satisfying certain conditions. By the express terms of the contract in question, the Sellers were "agents" of the Purchaser in leasing the apartments, collecting rents and refunding unforfeited security deposits, and Sellers were to be compensated for their duties in an amount equal to all "income and/or cash flow generated by the Project." If, during the time prior to December 31, 1974, a tenant did not satisfy the conditions precedent to receiving the return of all or part of his security deposit when his lease expired, the "Landlord" would be entitled to retain all or part of the security deposit as reimbursement for loss or expenses incurred.

The Sellers vigorously contend that "income and/or cash flow" is sufficiently broad to authorize them to keep all tenants' security deposits, whether or not such deposits were forfeited. We do not agree. This is not a reasonable construction of the contract as written. It is evident from the express language of the contract that the parties intended for the Sellers to act in the capacity of an agent in leasing and in managing the apartment complex on behalf of the Purchaser only until December 31, 1974. After this date, the parties intended the Purchaser to assume the duties of landlord and owner of the apartment complex. Article 5236e of the Texas Revised Civil Statutes (Supp.1978–79) generally governs the obligation of a landlord to return to tenants unforfeited security deposits. Pursuant to this article, Purchaser, as (the new) landlord and owner of the apartment complex, was legally liable for the return of all unforfeited security deposit refunds made subsequent to December 31, 1974, even though Sellers, as Purchaser's "agent," had collected these deposits prior to December 31, 1974. Had the parties intended for the Purchaser to be solely liable to the tenants for the unforfeited security deposits collected by the Sellers by allowing the Sellers to retain such deposits as a portion of the "income and/or cash flow generated by the Project," after all expenses had been paid, a specific provision requiring such result would have been included in the contract in question. The contract makes no such provision.

Our interpretation of this portion of the contract in question is further strengthened by an additional provision in paragraph 9. It requires a proration of the "income realized and expenses incurred" between the Sellers and the Purchaser as of December 31, 1974, and an accounting thereof prior to January 15, 1975. It is evident to us that the parties intended for the continuing obligations of the Purchaser, as landlord and owner, including its obligation to refund

unforfeited tenants' security deposits to be itemized in an accounting, and prorated accordingly as of December 31, 1974.

The problem that the parties experienced in this case was recognized by Chief Justice Calvert in *Moore v. Smith,* 443 S.W.2d 552 (Tex.Sup.1969):

"It is nearly always possible to find some provision in a lengthy written instrument which seems to some extent to be out of harmony with the main thrust of the instrument, but such provision or provisions should not be permitted to obscure the otherwise clearly indicated intention of the parties to the instrument." *Gulf Oil Corp. v. Southland Royalty Co.,* 478 S.W.2d 583, 586–87 (Tex.Civ.App.—El Paso 1972), writ ref'd n. r. e., 496 S.W.2d 547 (Tex.Sup.1973).

■ We hold that only one reasonable meaning clearly emerges from the four corners of the contract in question when aided by the rules of interpretation and construction. *Universal C. I. T. Credit Corp. v. Daniel,* 150 Tex. 513, 243 S.W.2d 154, 157 (1951). We are of the opinion that the trial court's judgment based upon the jury's verdict reaches the same result as the trial judge should have reached if he had interpreted and construed the contract in question as a matter of law. See *Carter v. Associates Discount Corp.,* 550 S.W.2d 399, 400 (Tex.Civ.App.—Amarillo 1977, no writ); *City of Houston v. Howe & Wise,* 323 S.W.2d 134, 143 (Tex.Civ.App.—Houston [1st Dist.] 1959, writ ref'd n. r. e.). This disposition renders appellants' points of error four and five immaterial for they could not affect the outcome of the case. Accordingly, appellants' points of error one through five are hereby overruled.

■ In point of error number six, Sellers complain, in effect, that the trial court erred in failing to offset against the total recovery, an amount the jury found that the Sellers had paid to persons who had performed management services for the apartment complex after December 31, 1974. This point of error is waived because it fails to meet the minimum briefing requirements. No authority is cited to support Sellers' general arguments that the trial court committed reversible error in this instance. It is not up to the appellate courts to brief points of error for attorneys. When a point of error is not briefed on appeal, it is waived. *Crutcher-Rolfs-Cummings, Inc. v. Ballard,* 540 S.W.2d 380, 389 (Tex.Civ.App.—Corpus Christi 1976, writ ref'd n. r. e.), cert. denied, 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977); *Inman v. Padrezas,* 540 S.W.2d 789, 797 (Tex.Civ. App.—Corpus Christi 1976, no writ); *City of Wichita Falls v. Harris,* 532 S.W.2d 653, 662 (Tex.Civ.App.—Fort Worth 1975, writ ref'd n. r. e.); *Whitson Company, Inc. v. Bluff Creek Oil Company,* 278 S.W.2d 339, 347 (Tex.Civ.App.—Fort Worth 1955), aff'd 156 Tex. 139, 293 S.W.2d 488 (1956); Rule 418, T.R.C.P.; see our local briefing rules in the appendix to *Dobie v. Continental Oil Company,* 552 S.W.2d 183 (Tex.Civ.App.— Corpus Christi 1977, writ ref'd n. r. e.). Appellants' point of error number six is overruled.

■ In point of error number seven, Sellers complain that the trial court erred in entering a judgment that required Sellers to account to Purchaser for "all income realized and expenses incurred in connection with the operation" of the project during the period from May 1, 1974 to December 31, 1974. The undisputed evidence introduced at trial established that at the end of the eight month period, Sellers delivered to Purchaser the January rent which had been collected in advance, and that no other accounting was tendered. Sellers complaint is that the contract expressly provided that the only accounting required was with respect to items which were subject to proration between the parties as of December 31, 1974. We do not agree.

The clause in question required that "income realized and expenses incurred" in the operation of the apartment complex "shall be prorated between the parties as of December 31, 1974." The contract further required that an accounting with respect to such income realized and expenses incurred shall be rendered on or before January 15, 1975. We believe that the parties contem-

plated that all monies obtained and all expenses paid during the full eight month period should be included in the accounting and that a proration would be based upon the parties' respective rights to claim the income, and obligations to bear the expenses would be determined in accordance with that accounting. Appellants' point of error number eight is also overruled.

The judgment of the trial court is hereby AFFIRMED.