This opinion is uncorrected and subject to revision before publication in the New York Reports.
--------------------------------------------------------------------
No. 44
Walter R. Beardslee, &c., et al.,
          Respondents,
        v.
Inflection Energy, LLC, et al.,
          Appellants.




              Thomas S. West, for appellants.
              Peter H. Bowman, for respondents.






PIGOTT, J.:

        The United States Court of Appeals for the Second

Circuit certified to this Court questions relating to oil and gas

leases entered into between various New York landowners and

energy companies.  The questions arise in the context of the

- 1 -

energy companies' claim that an express *force majeure* clause in
the subject leases was triggered by events beginning in July
2008, when then-Governor Paterson mandated formal public
environmental review to address the impact of the combined use of
high-volume hydraulic fracturing and horizontal drilling.  We
hold that the *force majeure* clause does not modify the habendum
clause and, therefore, the leases terminated at the conclusion of
their primary terms.

I.

The relevant statutory framework and background are
explained in detail in the decisions of the Federal District
Court (904 F Supp 2d 213 [NDNY 2012]) and the Second Circuit (761
F3d 221 [2d Cir 2014]).

Plaintiffs, various landowners in Tioga County, entered
into separate oil and gas leases with Victory Energy Corporation
(Victory), whereby plaintiffs leased to Victory "the rights of
drilling, producing, and otherwise operating for oil and gas and
their constituents, including the right to conduct geophysical,
seismic, and other exploratory tests" from under their property
for a nominal annual fee or, if drilling commenced, the right to
receive a royalty on gross proceeds.  The majority of the leases
were executed in 2001, although leases were also signed in 2002,
2004, 2005, 2006, and 2009.[1]  Victory shared its leasehold

_____

[1]  Most of the leases at issue were renewed for additional
five-year terms.  However, any extension/renewal does not alter

interests with Megaenergy, Inc.  In July 2010, defendant

Inflection Energy, LLC (Inflection) assumed from Megaenergy, Inc.

the operational rights and responsibilities under most of the

leases.

Each of the leases contains an identical term clause,

also known as a habendum clause,[2] which establishes the primary

and definite period during which the energy companies may

exercise the drilling rights granted by the leases.

Specifically, the leases' habendum clause provides:

> "It is agreed that this lease shall remain in
> force for a primary term of FIVE (5) years
> from the date hereof and as long thereafter
> as the said land is operated by Lessee in the
> production of oil or gas."

Under this provision, the interests conveyed by the leases exist

for a five-year "primary term," followed by an open secondary

term so long as the land is operated by the lessee in the

production of oil or gas.

Each lease also contains what the parties refer to as a

_____

the analysis here.  At oral argument before this Court, the
parties did not dispute that the leases were still in their
primary terms in 2008, when the alleged *force majeure* event
occurred.

[2]  Habendum clauses are typically found in standard oil and
gas leases to "establish a definite (or primary) term in which
the lessee [is] permitted to develop [] property, with an option
for an indefinite secondary term permitting the lessee to reap
the long-term value and return on the money spent developing the
property during the primary term" (Wiser v Enervest Operating,
L.L.C., 803 F Supp 2d 109, 118 [NDNY 2011] [quotation marks
omitted]).

"force majeure clause."  Generally, a force majeure event is an event beyond the control of the parties that prevents performance under a contract and may excuse nonperformance (see Kel Kim Corp. v Cent. Mkts., 70 NY2d 900, 902 [1987]).  The *force majeure* clause here provides:

> "If and when drilling or other operations hereunder are delayed or interrupted by lack of water, labor or material, or by fire, storm, flood, war, rebellion, riot, strike, differences with workmen, or failure of carriers to transport or furnish facilities for transportation, or as a result of some order, rule, regulation, requisition or necessity of the government, or as a result of any other cause whatsoever beyond the control of Lessee, the time of such delay or interruption shall not be counted against Lessee, anything in this lease to the contrary notwithstanding.  All express or implied covenants of this lease shall be subject to all Federal and State laws, Executive Orders, Rules or Regulations, and this lease shall not be terminated, in whole or in part, nor Lessee held liable in damages for failure to comply therewith, if compliance is prevented by, or if such failure is the result of any such Law, Order, Rule or Regulation."

On July 23, 2008, then-Governor David Paterson ordered formal public environmental review to address the impact of combined use of high-volume hydraulic fracturing (HVHF)[3]

---

[3] HVHF is "an unconventional drilling technology which involves the injection of more than a million gallons of water, sand, and chemicals at high pressure down and across into horizontally drilled wells as far as 10,000 feet below the surface" (Beardslee, 904 F Supp 2d at 216 n 4).  "The pressurized mixture causes the rock layer . . . to crack. . . . [and the] gas to flow into the well" (id.; see generally Matter of Wallach v Town of Dryden, 23 NY3d 728, 739 [2014], rearg denied 24 NY3d 981

(commonly known as "fracking") and horizontal drilling (2008
Directive).  In particular, he directed the New York State
Department of Environmental Conservation (DEC) to update and
supplement its 1992 generic environmental impact statement (GEIS)
on conventional oil and gas exploration (see Mem filed with New
York State Senate Bill Number 8169-A [July 21, 2008]).  On
December 13, 2010, following the DEC's issuance of a draft
Supplemental GEIS (SGEIS), Governor Paterson issued Executive
Order No. 41 in which he instructed the DEC to revise the draft
SGEIS and address "comprehensively the environmental impacts
associated with [HVHF] combined with horizontal drilling" in a
final SGEIS (see Executive Order [Paterson] No. 41 [9 NYCRR
7.41]).  The Governor also indicated that pursuant to the State
Environmental Quality Review Act (SEQRA), "no [HVHF] permits
[could] be issued" by the State before "the completion of a Final
SGEIS" (id.).[4]  In response to these developments, Inflection
sent notices of extension to the landowners, asserting that New
York's governmental action constituted a force majeure event
under the leases, which purportedly extended the leases' terms.

On September 7, 2011, the DEC released a Revised Draft
SGEIS, and issued a press release informing the public that "[n]o

---

[2014]).

[4]  This Court recently acknowledged the existence of a
moratorium on "[HVHF] combined with horizontal drilling"
(Wallach, 23 NY3d at 740 n 1, citing Executive Order [Paterson]
No. 41 [9 NYCRR 7.41]).

permits for [HVHF] will be issued until the SGEIS is finalized and [the DEC] issues the required Findings Statement."

It is undisputed that no operations have been conducted upon the leaseholds, that the energy companies have not produced oil and gas from the properties within the leases' primary terms, and that no royalties have been paid to the landowners.

## II.

In February 2012, after the primary term of the leases had expired, the landowners commenced this declaratory judgment action against Inflection, Victory, and Megaenergy (collectively, energy companies) in the United States District Court for the Northern District of New York, seeking a declaration that the leases had expired by their own terms. The energy companies answered and counterclaimed for a declaration to the contrary, arguing that each lease was extended by operation of the *force majeure* clause. In particular, the energy companies referenced the portion of the *force majeure* clause that states:

> "[i]f and when drilling . . . [is] delayed or interrupted . . . as a result of some order, rule, regulation, requisition or necessity of the government, or as the result of any other cause whatsoever beyond the control of Lessee, the time of such delay or interruption shall not be counted against Lessee, anything in this lease to the contrary notwithstanding. . . ."

The energy companies averred that New York's moratorium on the use of horizontal drilling and HVHF triggered the *force majeure* clause. The landowners, insisting that no *force majeure* event

had occurred, moved for summary judgment declaring that the leases had expired.  The energy companies opposed the motion and cross-moved for summary judgment declaring that the leases' primary terms were extended by a *force majeure* event so that the leases were still in full force and effect.

On November 15, 2012, the District Court granted summary judgment to the landowners, declaring that all of the leases had expired by their own terms, and entered judgment accordingly (see 904 F Supp 2d 213).  The District Court denied the energy companies' cross motion for summary judgment and dismissed their counterclaims holding that the *force majeure* clause did not extend the leases.[5]  It declined to rule on whether a *force majeure* event occurred, stating that even if it did, the *force majeure* clause would have no effect on the habendum clause and the lease terms because the energy companies did not have an obligation to drill.  The District Court also concluded that Governor Paterson's 2008 Directive did not frustrate the purpose of the leases, because the energy companies could drill using conventional methods and that the 2008 Directive was foreseeable.  The energy companies appealed.

The Second Circuit observed "that this case turns on significant and novel issues of New York law concerning the

_____

[5]  On the same day, the same court and Judge reached the same result with regard to other New York State oil and gas leaseholds in a case presenting similar facts (see Aukema v Chesapeake Appalachia, LLC, 904 F Supp 2d 199 [NDNY 2012]).

interpretation of oil and gas leases, a legal field that is both relatively undeveloped in the State and of potentially great commercial and environmental significance to State residents and businesses" (761 F3d 221, 224 [2d Cir 2014]).  Accordingly, it certified to this court, and we accepted, the following questions:

> (1) "Under New York law, and in the context of an oil and gas lease, did the State's Moratorium amount to a force majeure event?"
>
> (2) "If so, does the force majeure clause modify the habendum clause and extend the primary terms of the leases?"

(id. at 232; 23 NY3d 1047 [2014]).

We answer the second certified question, which the Second Circuit characterized as "in some respects more fundamental" (761 F3d at 230), in the negative.  The first certified question is therefore academic and need not be addressed.

### III.

The construction and interpretation of oil and gas leases is guided by basic principles of contract law (see Estate of Hatch v Nyco Minerals Inc., 245 AD2d 746, 747 [3d Dept 1997]), and the parties agree that New York law governs the leases in dispute.

Under New York contract jurisprudence, the intent of the parties controls and if an agreement is "complete, clear and unambiguous on its face[, i]t must be enforced according to the

plain meaning of its terms" (Greenfield v Philles Records, Inc.,
98 NY2d 562, 569 [2002]).  As this Court has indicated on
numerous occasions, "[c]ourts may not 'by construction add or
excise terms, nor distort the meaning of those used and thereby
make a new contract for the parties under the guise of
interpreting the writing'" (Riverside S. Planning Corp. v
CRP/Extell Riverside, L.P., 13 NY3d 398, 404 [2009], quoting
Reiss v Financial Performance Corp., 97 NY2d 195, 199 [2001]).
Moreover, the analysis should take into account that oil and gas
leases "stand on an entirely different basis from any other
leasehold agreements" (Conkling v Krandusky, 127 App Div 761 [4th
Dept 1908], citing Eaton v Allegany Gas Co., 122 NY 416 [1890]).
Such leases are "made in the context of a highly technical
industry, which employs distinct terminology used by those in the
business" (Wiser, 803 F Supp at 117).  For these reasons, an
agreement for the production of oil and gas must be construed
with reference to both the intention of the parties and the known
practices within the industry (see generally 3 Howard R. Williams
& Charles J. Meyers, Oil and Gas Law §§ 601, 603, 605 [2003 ed];
2 W.L. Summers, The Law of Oil and Gas [Perm ed 1959] at Chapters
7, 10, 11).

In light of these principles, we hold that the *force
majeure* clause does not modify the primary term of the habendum
clause and, therefore, does not extend the leases.  The habendum
clause in the leases does not incorporate the *force majeure*

clause by reference or contain any language expressly subjecting it to other lease terms (see Wiser, 803 F Supp at 121 ["where . . . the language of the habendum clause clearly makes that provision 'subject to' other provisions in the agreement . . . the life of the lease may be subject to modification"]; see also Sun Operating Ltd. P'ship v Holt, 984 SW2d 277, 286 [Tex Civ Ct App 1999]).  Moreover, the language in the *force majeure* clause stating that "the time of such delay or interruption shall not be counted against Lessee" does not refer to the habendum clause with specificity.  Thus, the habendum clause is not expressly modified or enlarged by the *force majeure* clause.

The energy companies, however, broadly assert that under New York law the phrase "anything in this lease to the contrary notwithstanding" has consistently been held to mean that, regardless of other contract terms, that clause controls. Accordingly, they insist that the *force majeure* clause necessarily has the effect of modifying the habendum clause.

As an initial matter, "under New York law, clauses similar to the phrase '[n]otwithstanding any other provision' trump conflicting contract terms" (Bank of New York v First Millennium, Inc., 607 F3d 905, 917 [2d Cir 2010] [emphasis added]; see generally BDC Finance L.L.C. v Barclays Bank PLC, __ NY3d __ 2015 NY Slip Op 01486 [Feb. 19, 2015]).  Accordingly, the language in the *force majeure* provision does not supersede all other clauses in the leases, only those with which it is in

conflict.  Based upon our analysis, because the force majeure clause is not in conflict with the provisions of the primary term of the habendum clause, the words "anything in this lease to the contrary notwithstanding" alone are insufficient to compel the conclusion that the force majeure clause modifies the primary term, as compared to the secondary term, of the habendum clause.

Because the *force majeure* clause expressly refers to a delay or interruption in drilling or production for any enumerated reason, it follows that the clause only conflicts with and, therefore, modifies the secondary term of the habendum clause, in which the lessee has the obligation to operate in the production of oil or gas, or the lease terminates.  Moreover, the second sentence in the *force majeure* clause, which deals exclusively with governmental regulations, pertains only to the energy companies' express or implied covenants -- the lessee's obligations.  As the energy companies made no express or implied covenants applicable to the primary term (other than to pay delay rentals, which are not at issue here), the *force majeure* clause must relate to only continuous drilling/production operations during the secondary term of the leases (see Aukema, 904 F Supp 2d at 210; see generally Eaton v Allegany Gas Co., 122 NY 416, 423 [1890]).  Furthermore, this latter sentence in the *force majeure* clause expressly indicates that the subject clause deals with lease termination, not lease expiration.  The corresponding habendum clause provision is its secondary term, which also

addresses the conditions under which the leases would terminate, whereas the primary term deals with lease expiration.

Thus, we interpret the "notwithstanding" language of the *force majeure* clause as excusing the energy companies' performance only during the secondary term of the habendum clause, during which operations in the production of oil and gas would be necessary for leases to remain viable.  To read the *force majeure* clause as applying to the primary term would be to interpret the leases in a manner contrary to the plain intent of the parties.

Our holding is consistent with out-of-state "oil" jurisdictions, in which courts, applying similar contract principles, have held that language identical or similar to the *force majeure* clause at issue here cannot extend the primary term set forth in the habendum clause (see Gulf Oil Corp. v Southland Royalty Co., 496 SW2d 547, 552 [Tex 1973]; see also San Mateo Community Coll. Dist. v Half Moon Bay Ltd. Partnership, 65 Cal App 4th 401, 412 [Cal Ct App 1998]; Natural Gas Pipeline Co. of America v Zimmer, 447 F Supp 66, 70 [ND Tex 1977], affd 576 F2d 106 [5th Cir 1978]; cf. Sun Operating Ltd. Partnership v Holt, 984 SW2d 277, 282-283 [Tex App 1998]).  And, as observed by our sister courts, had the energy companies intended for the habendum clause to be subject to other provisions of the contract, they could have expressly so indicated (see Kirker v Shell Oil Co., 104 Cal App 2d 497, 503 [Cal Ct App, 2d App Dis, Div 1, 1951]).

Accordingly, the first question need not be answered as academic, and the second certified question should be answered in the negative.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

Following certification of questions by the United States Court of Appeals for the Second Circuit and acceptance of the questions by this Court pursuant to section 500.27 of this Court's Rules of Practice, and after hearing argument by counsel for the parties and consideration of the briefs and record submitted, second certified question answered in the negative and first certified question not answered as academic.  Opinion by Judge Pigott. Chief Judge Lippman and Judges Read, Rivera, Abdus-Salaam, Stein and Fahey concur.


Decided March 31, 2015